653 So.2d 1187 (1995)
Kenneth E. CARPENTER, Sr., Plaintiff-Appellant,
v.
LAFAYETTE WOODWORKS, INC., et al., Defendants-Appellees.
No. 94-1011.
Court of Appeal of Louisiana, Third Circuit.
February 1, 1995.
Opinion Amending Decree on Granting of Rehearing April 25, 1995.
*1189 Otis Eugene Lomenick, Jr., G. Frederick Seemann, Opelousas, for Kenneth E. Carpenter, Sr.
Joseph J. Piccione, James Kirk Piccione, Lafayette, for Lafayette Woodworks, Inc., et al.
James L. Pate, Lafayette, for LIGA & Oregon Ins. Guar. Assoc.
Before DOUCET, C.J., and THIBODEAUX and SULLIVAN, JJ.
SULLIVAN, Judge.
This is a redhibition suit in which plaintiff-appellant, Kenneth E. Carpenter, Sr., seeks to rescind the June 14, 1984 sale of a 1983 Monaco motor home. In his petition, Carpenter named as defendants the seller, Lafayette Woodworks, Incorporated d/b/a R.V. Sales (R.V. Sales), and the manufacturer, Monaco Motorhomes, Incorporated (Monaco). The motor home was manufactured at Monaco's Oregon factory. Plaintiff alleged the presence of numerous defects in the motor *1190 home, the most prominent of which is a chronically defective roof allowing rainwater leakage. After numerous third-party demands and cross-claims were filed, Monaco was placed into bankruptcy. Its insurer was eventually placed into receivership and the Oregon Insurance Guaranty Association was substituted as a party-defendant in its stead. Thereafter, all third party defendants were dismissed from this suit by way of separate summary judgments. R.V. Sales was the sole remaining defendant at the time of trial.
Following trial, the district judge rendered judgment, pursuant to written reasons, denying plaintiff rescission of the sale because he determined that plaintiff failed to give R.V. Sales and Monaco a reasonable opportunity to repair the defects. This failure, according to the trial court, precluded the remedy of rescission. However, the trial court awarded Carpenter a $14,500 reduction in the purchase price. On March 4, 1994, the trial court signed a judgment in accordance with these reasons.
Plaintiff appeals and assigns six errors for consideration on appeal:
1) failing to find that the defects in the motor home were redhibitory in nature;
2) finding plaintiff failed to give defendant a reasonable opportunity to repair the motor home;
3) failing to find the defect was known to Lafayette at the time of sale and existed prior to the sale;
4) failing to award plaintiff adequate damages and attorney's fees;
5) finding the motor home purchase price to be $62,995; and,
6) allowing pre-trial correspondence between counsel into evidence.
R.V. Sales answered Carpenter's appeal, urging that the trial court erred in awarding an excessive reduction in the purchase price and in accepting plaintiff's mobile/motor home repairman as an expert witness.
After a thorough and careful review of the record, we conclude that the trial court's judgment is clearly erroneous. Accordingly, we reverse, order rescission of the sale, and award attorney's fees to the plaintiff.

FACTS
Carpenter purchased the 1983 Monaco motor home from R.V. Sales on June 14, 1984. He bought the Monaco for both business and pleasure use. Carpenter, a self-employed drilling specialist consultant, planned to use the motor home as a mobile office and sleeping quarters at onshore drilling rig sites. He also planned to travel and camp in the motor home with his family. The purchase price of the motor home was an issue at trial. Carpenter contended that he paid $55,995 in cash and received a $27,205 trade-in allowance on his 1977 Cobra mini-home, for a total purchase price of $83,200. R.V. Sales agreed that Carpenter paid $55,995 in cash but, contradictorily, maintained that he received only $7,000 in trade value for the mini-home. Under R.V. Sales' scenario, Carpenter paid $62,994 for the Monaco. The trial court accepted the R.V. Sales figure of $62,995 as the actual purchase price and, as noted, Carpenter assigns this as error on appeal.
R.V. Sales originally took possession of the Monaco motor home in April of 1983. In the intervening period between the taking of possession from Monaco and the sale to Carpenter, R.V. Sales primarily used the motor home as a demonstrator and for promotional purposes at trade shows. During this time, several repairs were made to the motor home and its various components. From May 2, 1983 to January 7, 1984, roof leaks were sealed at the television antenna, the bath vent, the shower skylight, the refrigerator vent, the driver's side door and the driver's side windshield. R.V. Sales also replaced the motor cover fiberglass insulation, the starter, the front grill and bumper, the main 30 amp circuit breaker, the left rear-view mirror, the driver's chair, the emergency brake, and the hot water heater. Additionally, R.V. Sales reinstalled loose interior paneling, repaired cracked fiberglass covering the front end, and balanced the entry door. All of the enumerated repairs were done during the 13½ months during which R.V. Sales had possession of the motor home.
The day after Carpenter took possession of the motor home, a severe thunderstorm hit the south Louisiana area, causing heavy rains. Carpenter noticed the roof leaking *1191 and returned the vehicle to R.V. Sales on June 16, 1984. R.V. Sales' repair technicians removed the air conditioner roof gasket and resealed it. They also sealed the awning frame and the border surrounding the passenger window. On June 22, 1984, Carpenter returned to R.V. Sales for relatively minor repairs, i.e., rust removal, door alignment and repainting, hood crack repair, and signal light fuse replacement. On July 9, 1984, R.V. Sales sealed a leak at the center windshield, replaced a heater hose and repaired the refrigerator. At this point, R.V. Sales contacted Monaco on behalf of Carpenter and requested a two-year warranty extension. Monaco complied with this request at no additional cost to Carpenter.
On July 16, 1984, the motor home was sent to Service Chevrolet in Lafayette because of an oil leak. Service Chevrolet replaced a leaking valve cover and the right exhaust manifold. Additionally, the parking brake was adjusted. On August 13, 1984, the Monaco's gas-powered hot water heater was repaired because the pilot light was not operational. A month later, on September 12, 1984, the hot water heater was repaired again and the bedroom ceiling light ballast was replaced. On October 22, 1984, the hot water heater system, being once again inoperative, was replaced in its entirety. Also, a large accumulation of water was discovered in the front storage compartment and the interior liquefied petroleum gas sensor did not operate properly.
On November 6, 1984, Carpenter once again complained of rainwater leaks along the left side of the motor home. R.V. Sales removed the factory-installed sealant and resealed the left side of the roof. Additionally, R.V. Sales removed sealant from around the various vents and skylights and resealed them as needed. The leaks had caused discoloration and stains on the interior furniture and wood paneling. In late November, 1984, Tom Jardell, then R.V. Sales' general manager, and Carpenter composed a letter to Monaco detailing the motor home's extensive repair history and explaining Carpenter's concerns and position on what should be done to remedy the flaws noted. Carpenter returned the motor home on December 5, 1984 for adjustment of the entry door and clearance of a water system clog.
The Monaco motor home apparently had no further problems until April 15, 1985, when R.V. Sales replaced the exterior storage compartment door, which was damaged by water corrosion. Also on this date, R.V. Sales replaced the leaking shower skylight and a rotten support board thereunder and resealed the leaking windshield. Thereafter, on May 6, 1985, R.V. Sales painted the replaced storage compartment door, replaced a water dump valve gasket, and sealed the leaking compartment door located next to the generator. In late May of 1985, Service Chevrolet replaced the left front suspension spring and shim.
On June 4, 1985, while Carpenter and his wife were traveling through Oklahoma, a fan belt broke. They brought the motor home to a Chevrolet dealership, which replaced the fan belt and repaired the belt pulley mechanism.
On June 12, 1985, Carpenter returned the motor home to R.V. Sales once again complaining of rainwater leaks and other problems. R.V. Sales resealed rain leaks in the dash area and shower skylight, adjusted and leveled the doors and added a quart of oil because, as Carpenter complained, the motor burned a quart of oil every 600 to 700 miles. The motor home remained on R.V. Sales' premises until late August, 1985.
In August, 1985, Monaco agreed to repair Carpenter's motor home at its Oregon facility. At first, Monaco asked Carpenter to drive the vehicle to Oregon. When he declined for business reasons, Monaco agreed to supply a driver. Monaco was to fully disassemble the defective roof and replace it with a new one at no cost to Carpenter. This oral agreement was reduced to writing by means of a letter drafted to Monaco from Jardell of R.V. Sales and Carpenter. He initially agreed to this arrangement, but, soon thereafter, requested that Monaco provide a comparable substitute motor home and reimburse him 50 cents per mile for normal "wear and tear" put on the motor home during the trip to Oregon. Monaco refused to provide the mileage reimbursement, and, additionally, Carpenter was not satisfied with *1192 the replacement Winnebago that R.V. Sales agreed to let him use. Because of this, Carpenter refused to let his motor home be transported to Oregon for the repairs. When Carpenter informed R.V. Sales that he would seek the advice of an attorney, he was told to remove the motor home from R.V. Sales' premises. Carpenter drove the motor home to his house in Opelousas and parked it in his backyard. He covered the roof with tarpaulins and has not used the motor home for business or pleasure since August of 1985. This suit was instituted by Carpenter on October 24, 1985.
In December, 1985, Carpenter had the air conditioner fan belt repaired by Bayou Salvage. In June, 1986, the motor home's rear end was repaired by Margot, Incorporated of Baton Rouge.
Carpenter testified that he was not advised by R.V. Sales personnel, either before or at the time of the sale, of the motor home's propensity to leak rainwater. He became aware of the leaks about 36 hours after the purchase. Carpenter did acknowledge being informed of problems associated with the hot water heater, parking brake, and refrigerator. He used the motor home 12 or 13 times during the approximate year following the sale. He stated further that R.V. Sales is located approximately 31 miles from his home, which made it inconvenient for him to have the motor home repaired so often. Carpenter explained that he always gave R.V. Sales an opportunity to repair the motor home until the August, 1985 disagreement concerning sending it to the Monaco factory. He stated that he did not allow the motor home to go to Oregon because he and the defendants could not agree on a comparable substitute home or for mileage reimbursement. Also, he did not believe that Monaco could properly repair the motor home. Carpenter also said that, on two occasions, he asked for his money back in exchange for his return of the motor home. He stated that, had he known of the defects in the motor home at the time of the sale, he would not have purchased the vehicle.
Antoine Alleman, owner of Tony's Mobile Home Service, testified on behalf of plaintiff as a motor home and mobile home repair expert. He inspected the motor home once in July, 1985, twice in 1986, and once again in 1993. At the 1985 inspection, he found leaks around the television antenna and skylight and rusty screws that were supposed to secure the corner molding. He also found fiberglass cracks in the front cap area, above the cabinets, and along the air conditioners, skylight and back bedroom areas. In Alleman's opinion, the corner molding edges were not properly sealed. The molding, which was secured with screws to adhesive tape, did not create a good seal with the roof itself. In 1986, Alleman's inspections revealed essentially the same findings in addition to several other leak spots not previously located. By 1993, the walls to the motor home were warped and many roof screws had rusted out. According to Alleman, the roof had no adhering ability whatsoever. He attributed this progressive deterioration to water trapped in the roof and walls from 1986 to 1993, given that Carpenter had covered the roof with tarpaulins during this period. He did not attribute the deterioration to new water getting into the roof cracks.
Alleman stated that he could not estimate the cost to repair the motor home without removing the roof to determine the extent of structural damage. He explained that a complete repair would require (1) dismantling the roof, (2) removing the appliances and pulling back the loose hung fiberglass, (3) replacing damaged and defective structures, wood, and insulation, (4) cleaning all surfaces, (5) applying beetle caulk or tape under the roof frame, (6) reassembling the roof, and (7) applying a weatherproof sealant to the roof.
Daniel Everett, an expert in the manufacture and repair of motor homes who is employed by Fleetwood Homes, testified on behalf of R.V. Sales. He inspected the motor home on January 14, 1987 and October 15, 1993. In 1987, when the tarpaulins were removed, he noticed standing water on the roof. He found the sealants to be in average condition and saw signs of interior water leaks, but, overall, he felt the motor home was in fair condition. He opined that the motor home was usable as intended. Everett *1193 recommended that the motor home be returned to the factory for the installation of a glued-down roof to replace Monaco's loose hung design. In 1993, Everett found the motor home sealant had deteriorated. He also stated that water was also once again evident under the tarpaulins.
Keith Thibodeaux, R.V. Sales' service manager during 1984 and 1985 (now its sales manager), was also accepted by the trial court as a motor home repair expert. He had personal knowledge of the motor home's repair history and was also present at the October 15, 1993 inspection. He stated that water had seeped into the roof through the tarpaulins from 1985 to 1993. As a result, the interior roof structure lost continuity of form and substantially deteriorated. He contested plaintiff's expert's assertion that the progressive deterioration was caused solely by water which had seeped into the motor home before 1985. Thibodeaux estimated that the cost to repair the roof was $2,050 in 1985 and $3,600 in 1993. Additionally, Thibodeaux explained that, in 1993, the motor home required $2,100 in internal repairs and $8,300 in other repairs. Thus, the total 1993 cost to place the motor home into a "marketable" condition, according to Thibodeaux, was $14,000. He stated that performing the recommended repairs in 1985 would have minimized the damage found in 1993. He attributed the increased repair cost to plaintiff's failure to repair in 1985 and the further deterioration in the interceding eight years.
Russell Broussard, an expert appraiser, also testified on behalf of R.V. Sales. He inspected the motor home on October 15, 1993. In his opinion, the 1993 actual cash value of the motor home was $24,950. In 1986, the actual cash value was $60,100. These figures were derived by determining the average retail value ($28,950 in 1993; $62,150 in 1986) less the minimum repair cost ($4,000 in 1993; $2,050 in 1986). He also stated that, if the motor home required $14,000 in repairs in 1993, then its 1993 actual cash value would drop to $14,950 ($28,950 - 14,000).

OPINION
The eight errors assigned by the parties present the following issues for our resolution:
(1) Is plaintiff entitled to a rescission of the sale or merely a reduction in purchase price?
(2) Is plaintiff entitled to an award for attorney's fees?
(3) Did the trial court err in finding the purchase price to be $62,995?
(4) Did the trial court err in allowing pre-trial correspondence between counsel into evidence?
(5) Did the trial court err in accepting plaintiff's repairman as an expert witness?
Redhibition
The trial court denied plaintiff's claim for rescission specifically because he found that, in refusing to allow the motor home to go to Oregon, plaintiff thereby failed to give defendant a reasonable opportunity to repair the motor home. Instead, the trial court awarded a $14,500 reduction in the purchase price. On appeal, plaintiff seeks rescission, and defendant asserts that the reduction in purchase price should be lowered to $2,050, the 1985 cost to repair.
The Civil Code articles pertaining to sales were substantially revised by Act 841 of 1993, which was made effective on January 1, 1995. Because the events pertinent to this case occurred prior to this effective date, the former version of the codal provisions is applicable and shall be so cited where necessary.
La.C.C. art. 2520 which allows the action for redhibition provides:
Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice.
The purchaser has the burden of establishing that the defect existed at the time of purchase, but was neither known or apparent to him. Also, he must prove that the thing sold is absolutely useless for its intended purpose or that its use is so inconvenient that it must *1194 be supposed that he would not have bought it had he known of the defect. LeBlanc v. Mercedes-Benz of North America, Inc., 93-307 (La.App. 3rd Cir. 3/2/94); 633 So.2d 399, writ denied, 94-1225 (La. 7/1/94); 639 So.2d 1169; Oliver v. Chrysler Corporation, 510 So.2d 1320 (La.App. 3rd Cir.1987), citing Dickerson v. Begnaud Motors, Inc., 446 So.2d 536 (La.App. 3rd Cir.1984), writ denied, 449 So.2d 1349 (La.1984). A good faith seller, one who knew not the vices of the thing, must repair, remedy, or correct the vices. If he is unable to or fails to do so, he must restore the purchase price plus reasonable sale and preservation expenses, subject to a credit for the value of any fruits or use the purchaser has drawn from it. La.C.C. art. 2531. The statute allows the seller in good faith the opportunity to repair the defective thing before the buyer can tender it for rescission. It is the persistence of the defect after attempted repair that gives rise to the right to rescission. Coutee v. Williams, 611 So.2d 803 (La.App. 3rd Cir. 1992). A bad faith seller, one who knows the vice of the thing he sells and omits to declare it, is additionally liable for damages and attorney's fees. La.C.C. art. 2545. In a redhibition suit, the judge may decree merely a reduction of the price. La.C.C. art. 2543.
The trial court's ultimate determination as to whether a defect is egregious enough to warrant rescission of the sale or merely inconvenient so as to warrant a reduction in the price is factual in nature. As such, the trial court's findings are entitled to great weight on appeal and should not be disturbed absent a finding of manifest error or clear wrongness. Brannon v. Boe, 569 So.2d 1086 (La.App. 3rd Cir.1990); Smith v. General Motors Acceptance Co., 542 So.2d 831 (La.App. 3rd Cir.1989).
The key inquiry is whether the trial court manifestly erred in finding that Carpenter did not give R.V. Sales and Monaco a reasonable opportunity to repair the motor home.
The evidence indicates that, from June 14, 1984 (the date of purchase) to June 12, 1985, Carpenter returned the motor home to R.V. Sales 13 times for repair work. On seven of these occasions, plaintiff's primary complaint concerned the leaking roof. Each time, the repair work was done by either R.V. Sales or Service Chevrolet at no cost to Carpenter. He initially agreed to allow the motor home to go to Oregon, but later declined the comprehensive roof repair because of a lack of confidence in Monaco and Monaco's refusal to pay mileage and provide a comparable substitute motor home. It is undisputed that Monaco agreed to install the new roof at no cost to Carpenter. The trial court determined that his refusal was unreasonable under the circumstances.
After thoroughly reviewing the record, we conclude that the trial court's determination was manifestly erroneous and clearly wrong. The motor home was burdened with numerous defects which were ostensibly repaired with each tender of the motor home to R.V. Sales, with the exception of the chronically leaking roof. Carpenter's motor home spent a large portion of the year at R.V. Sales being repaired. After each repair trip, another problem would arise requiring the attention of R.V. Sales. Clearly, this near continual recurrence of defects, especially the rainwater leaks, was both professionally and personally inconvenient to Carpenter. He spent as much time bringing the motor home to Lafayette for service as he did using the motor home in his oilfield consulting business. Most frustrating to Carpenter were the chronic and persistent roof leaks which rendered the motor home practically useless for its intended purpose. The record indicates that, before not allowing the motor home to go to Oregon, Carpenter always tendered the motor home to R.V. Sales for repairs. This constituted the giving of a reasonable opportunity to repair the motor home. Each time, however, the problems encountered were not completely rectified by R.V. Sales and the leakage problem was never corrected.
The roof repair proposed by Monaco constituted a major "overhaul" of the motor home. Monaco proposed to remove the roof and entirely replace it with a new roof. While this would seem to be the next logical step after the failure of many resealing efforts, it cannot be said that Carpenter, in refusing to allow the complete roof replacement, did not give R.V. Sales and Monaco a *1195 reasonable opportunity to repair. The trial court apparently lost sight of the undisputed fact that, prior to this time, Carpenter had cooperatively, consistently and reasonably returned the motor home to R.V. Sales for service. In our opinion, a purchaser's duty to give the seller a reasonable opportunity to repair defects does not encompass a complete "overhaul" of a major component of the thing which has been the subject of numerous prior repair attempts. In other words, under the particular facts of this case, Carpenter discharged his duty to give a reasonable opportunity to repair the leaks by tendering the motor home to R.V. Sales for repair of the leaks on seven separate occasions during the year in question.
Having found that the trial court erred in this respect, we conclude further that, given the numerous defects in the motor home, plaintiff is entitled to a rescission of the sale. It is clear that, under the standard enunciated in La.C.C. art. 2520, these defects which existed at the time of sale rendered the use of the motor home, at the very least, so inconvenient and imperfect that it must be supposed that plaintiff would not have purchased it had he known of the defects. Therefore, we will order a rescission of the sale.
Attorney's Fees
Plaintiff contends the trial court erred in failing to find R.V. Sales liable for attorney's fees.
Attorney's fees are awardable when, at the time of sale, the seller knows of the defects and yet conceals their existence. In other words, a purchaser can recover attorney's fees when the seller is in "bad faith". La. C.C.art. 2545, supra. Plaintiff urges R.V. Sales' personnel knew of the defective nature of the motor home at the time of the sale and, with the exception of the hot water heater, parking brake, and refrigerator, failed to disclose such defects.
The evidence indicates that, prior to the sale, R.V. Sales performed numerous repairs on the motor home, including resealing of water leaks at six separate locations thereon. During this time, the motor home was used as a demonstrator by Odell Bordelon, the principal owner of R.V. Sales. She stated that, while she drove the motor home, the only problems she experienced were a rattling microwave and a windshield leak. The documentary evidence, consisting of R.V. Sales' service records, however, contradicts her testimony. Additionally, on cross-examination, Jardell, R.V. Sales' general manager, testified concerning the extensive pre-sale repair history, including roof leakage. Thibodeaux, R.V. Sales' then service manager, stated in his deposition that he did a pre-delivery check of the motor home. The resulting checklist was kept in Carpenter's file at R.V. Sales, but Carpenter was not shown or made aware of the checklist. No witness testifying on behalf of R.V. Sales contradicted Carpenter's assertion that he was not told at the time of the sale of the motor home's propensity to leak.
While R.V. Sales' personnel may have thought the prior repairs had sufficiently rectified the defects, they clearly knew of the motor home's propensity to leak and did not disclose this to Carpenter at the time of sale. It belies reason to suggest that, having repaired leaks at six points on the motor home, R.V. Sales did not have a duty to inform plaintiff of at least the fact that, in the past, the motor home experienced leaks. Clearly, the disclosure of defects in the hot water heater, parking brake, and refrigerator was not sufficient to inform Carpenter of the true condition of the motor home at the time of the sale. Under these circumstances, R.V. Sales knew of the defective nature of the motor home and failed to inform Carpenter of these defects. Thus, R.V. Sales was in "bad faith" and is liable to plaintiff for attorney's fees.
In Buteau v. Leleux, 591 So.2d 1261 (La. App. 3rd Cir.1991), this court enumerated the factors to consider in awarding attorney's fees in a redhibition case as follows:
1. The responsibility incurred;
2. The extent and nature of the work performed;
3. The legal know how and skill of counsel; and,
4. The amount of the claim and the amount recovered for the plaintiff.
*1196 Plaintiff's attorney, Otis Lomenick, stated that he worked a total of 300 hours on plaintiff's case. However, on cross-examination, he stated that this work included the defense of motions for summary judgment filed by third party defendants. Additionally, the time included work on appeals of these summary judgments. Considering this testimony in light of the above factors, we shall award plaintiff $10,000 in attorney's fees.
Purchase Price
The trial court determined that the 1984 purchase price of the motor home was $62,995. Plaintiff contends that the purchase price was actually $83,200, consisting of $55,995 cash and a $27,205 trade-in on the 1977 Cobra mini-home.
The receipt of sale shows a total price of $83,200 as argued by Carpenter. However, Keith Tucker, the R.V. Sales salesman who sold the motor home to Carpenter, explained that he drew up the invoice with the inflated values. He stated that he routinely does so unless the purchaser specifies otherwise. This was done to allow the purchaser to take advantage of a greater equity value and have more potential for depreciation. Defendant's exhibit number five, which Tucker prepared, is an appraisal worksheet showing the 1977 Cobra mini-home with a wholesale value of $7,550 and a trade-in value of $7,000. R.V. Sales also presented the subsequent $7,300 bill of sale for the Cobra to Gibbens Auto Works. Additionally, Carpenter himself stated that, when originally purchased, the 1977 Cobra mini-home cost "somewhere in the twenties" (thousands). However, he still maintained that he received $27,205 for the 1977 Cobra mini-home in trade.
Given these facts, the trial court's conclusion that the 1984 trade-in value of the 1977 Cobra mini-home was $7,000 is not manifestly erroneous. Therefore, the trial court did not err in finding the Monaco's sales price to be $62,995.
Attorney's Correspondence
Carpenter claims the trial court erred in admitting into evidence reciprocal letters written by opposing counsel. He claims that such evidence was not admissible because it contained evidence of compromise negotiations. R.V. Sales presented the correspondence and the trial court admitted same into evidence as proof of plaintiff's failure to mitigate damages.
In view of our conclusion reversing this case on the merits, we consider this assignment of error to be moot.
Plaintiff's Expert
Defendant asserts the trial court erred in accepting plaintiff's repairman, Antoine Alleman, as an expert in motor home repair. R.V. Sales contends that his experience, mainly in mobile home repair, was not sufficient to qualify him as an expert in motor home repair.
It is well settled that the qualification of a witness as an expert is within the trial court's wide discretion, and such a determination will not be disturbed on appeal absent a showing of manifest error. Mitchell v. Fradella, 628 So.2d 1198 (La.App. 3rd Cir.1993), writ not considered, 94-0079 (La. 3/11/94); 634 So.2d 405. Alleman stated that he had worked for Wellington Homes in Arnaudville, Louisiana, manufacturing mobile homes. At the time of trial, he was the owner of Tony's Mobile Home Service. He serviced motor homes, mobile homes, and campers. Since 1981, Alleman worked on between 50 and 100 motor homes and, in the process of some repairs, removed the roof. Alleman has been asked to consult on motor home roof leaks about six times per year. On traversal of his qualifications, he admitted that he had not worked for a motor home manufacturer or attended a manufacturer's repair seminar.
We conclude that the trial court did not abuse its discretion in accepting Alleman as an expert in motor home repair. This assignment of error is meritless.

CONCLUSION
For these reasons, we reverse the judgment of the trial court. We hereby render judgment in favor of plaintiff, Kenneth Carpenter, and against defendant, Lafayette Woodworks, Incorporated d/b/a R.V. Sales, in the amount of $72,995, consisting of a $62,995 return of the purchase price and $10,000 in attorney's fees. Carpenter is ordered *1197 to return the motor home to R.V. Sales. Costs at the trial level and on appeal are to be paid by R.V. Sales.
REVERSED AND RENDERED.
Before DOUCET, C.J., and THIBODEAUX and SULLIVAN, JJ.

ON REHEARING
PER CURIAM.
Both plaintiff, Kenneth Carpenter, and defendant, Lafayette Woodworks, Inc., d/b/a R.V. Sales, have applied for rehearing in this matter. Carpenter's application raises three issues, namely this court's failure to award legal interest, insurance and financing costs associated with the purchase and preservation of the motor home. In its application for rehearing, R.V. Sales seeks a credit for plaintiff's use of the motor home and a clarification of our prior decree insofar as costs of these proceedings are concerned.
For the following reasons, we amend our prior decision to reflect an award to plaintiff of his financing cost and legal interest from the date of judicial demand until paid. We also grant defendant a credit for plaintiff's use of the motor home and clarify our prior decree as to costs. We reject plaintiff's claim for his cost of insuring the motor home.

FINANCING COST
It is well settled that interest expended in connection with the financing of a vehicle which is found to be redhibitory is a recoverable expense occasioned by the sale as well as one incurred for the preservation of the thing. La.C.C. arts. 2531, 2545; Prince v. Paretti Pontiac Company, Inc., 281 So.2d 112 (La.1973); Sonfield v. Burleson, on rehearing, 543 So.2d 488, 493 (La.App. 4 Cir.), writ denied, 546 So.2d 1220 (La.1989); Smith v. Max Thieme Chevrolet Company, Inc., 315 So.2d 82 (La.App. 2 Cir.1975); Cain v. Rapides Dodge, Inc., 207 So.2d 918 (La. App. 3 Cir.1968). The claimant in redhibition is entitled to an award of finance charges, if sufficiently proven, upon rescission of the sale.
Our review of the record indicates that Carpenter secured financing from First Acadiana National Bank for the purchase of the motor home. Mark LeBlanc, Vice President of commercial lending for First Acadiana, testified on behalf of Carpenter. Le-Blanc stated that the principal amount borrowed by Carpenter in June 1984 was $52,727.76. Carpenter made timely payments on the loan and completed paying off the loan in July 1989. LeBlanc stated that, over the five year loan term, Carpenter actually paid $19,730.42 in interest on the loan. Carpenter is entitled to recovery of this amount from R.V. Sales.

INSURANCE COSTS
Carpenter testified that, from the date of purchase to the date of trial, he expended a total of $9,452.85 in insurance premiums for coverage of his motor home. In connection with his testimony, plaintiff entered into evidence a written statement from his insurance agent detailing each premium charge and payment. On rehearing, he seeks recovery of this amount. We decline to award this element of plaintiff's cost for the following reasons.
On cross examination, Carpenter stated that, during the period from the purchase to when he parked the motor home, he carried liability, comprehensive, collision and uninsured motorist coverages on the motor home. The limits of his liability coverage were $100,000.00 per person and $300,000.00 per accident with a $1,000,000.00 umbrella coverage. Carpenter stated that, after he parked the motor home, he substantially reduced the level of his coverage. He was unable to say what percentage of the payments were incurred for each particular coverage category.
Our review of this state's jurisprudence reveals no case in which a claimant in redhibition was awarded his insurance costs. We do not, in this opinion, resolve the question of whether insurance costs are recoverable in redhibition because we find that Carpenter failed to carry his burden of proof. Assuming, arguendo, that insurance expenses are recoverable, only those which are "incurred for the preservation of the thing" [La.C.C. art. 2531, supra, and La.C.C. art. 2545] are subject to restoration by the seller. Liability coverage (which protects the owner's financial *1198 interest when he is at fault in an accident) and uninsured motorist coverage (which protects the owner involved in an accident which is the fault of an uninsured motorist) do not constitute costs incurred to preserve the thing. Carpenter did not specify which portion of the premium was for collision and comprehensive coverages. Clearly, it was not the entire amount expended. Under these circumstances, we deny Carpenter's claim for insurance expenses associated with the motor home.

LEGAL INTEREST
Plaintiff is also entitled to legal interest, computed pursuant to La.C.C. art. 2924, from the date of judicial demand for rescission until payment. As noted in Sonfield, 543 So.2d at 494, such an award of legal interest on the purchase price is appropriate because R.V. Sales has had the use of plaintiff's money since the sale.

CREDIT FOR USE
R.V. Sales seeks a credit for Carpenter's use of the motor home. A credit for the claimant's use of the thing is authorized by La.C.C. art. 2531 and can inure to the benefit of a bad faith seller. Alexander v. Burroughs Corporation, 359 So.2d 607 (La. 1978). There is no established rule for the calculation of a credit for use. Chenniliaro v. Kaufman and Broad Home Systems of Louisiana, Inc., 93-1126 (La.App. 1 Cir. 1/19/94), 636 So.2d 246. If the seller establishes a right to recover the credit, but damages are not exactly estimable, courts have the discretion to calculate the amount of the credit based upon the particular facts and circumstances of the case. Associates Financial Services Company v. Ryan, 382 So.2d 215 (La.App. 3 Cir.1980). Generally, our courts have awarded a credit for use of a vehicle based on a percentage of the mileage put on the vehicle by the claimant. We note also that we need not award a credit for use if the claimant's use and enjoyment of the thing has been substantially outweighed by the inconvenience of the redhibitory defects. LeBlanc v. Mercedes-Benz of North America, 93-907 (La.App. 3 Cir. 3/2/94), 633 So.2d 399; writ denied, 94-1225 (La. 7/1/94), 639 So.2d 1169.
The R.V. Sales repair orders indicate that, on the date of purchase, the motor home had previously been driven 3,983 miles. On June 12, 1985, the date of the last repair order, the odometer read 10,049 miles. Approximately one year later on June 9, 1986, Carpenter had repair work performed at Margot, Inc. in Baton Rouge. On that date, the repair order reflects an odometer reading of 10,287 miles, only 238 miles more than one year previously. We shall base the credit on the 6,066 miles traveled between June 14, 1984 and June 12, 1985. At twenty-nine (29) cents per mile, the credit to which R.V. Sales is entitled is $1,759.14.

COSTS
We amend our prior decree to reflect that all costs of the trial court dealt with by the trial judge in his March 9, 1994 order are to be paid pursuant to that order. All additional costs incurred at the trial level, if any, and all costs of this appeal are assessed to R.V. Sales.

DECREE
For these reasons, we amend our prior decree in this matter to reflect an increase in the award in favor of plaintiff, Kenneth Carpenter, in the amount of $19,730.42. The aggregate award is subject to a credit for use in favor of R.V. Sales in the amount of $1,759.14. Furthermore, plaintiff is entitled to legal interest on the purchase price of the motor home, $62,995.00, from the date of judicial demand until paid. In all other respects, our prior decree remains in full force and effect. Costs at the trial level and on original appeal are assessed in accordance with this opinion. Costs of this rehearing are to be borne equally by plaintiff and defendant.
AMENDED IN PART; RENDERED.