701 So.2d 487 (1997)
Patrick VIATOR, Plaintiff-Appellee,
v.
LIVERPOOL & LONDON STEAMSHIP PROTECTION AND INDEMNITY ASSOCIATION, Falcon Drilling Company, Inc. and Falrig Offshore (U.S.A.), Inc., Defendants-Appellants.
No. 97-264.
Court of Appeal of Louisiana, Third Circuit.
October 8, 1997.
Rehearing Denied December 8, 1997.
*490 James Parkerson Roy, Lafayette, for Patrick Viator.
Charles A. Mouton, Richard J. Hymel, Lafayette, for Liverpool & London Steamship, et al.
Before DOUCET, C.J., and DECUIR and AMY, JJ.
DOUCET, Chief Judge.
This suit arises out of an accident on an offshore jack-up rig. The defendants, Falcon Drilling Company, Inc. (Falcon), Falrig Offshore (U.S.A.), L.P. (Falrig), and Liverpool and London Steamship Protection and Indemnity Association (Liverpool) appeal the judgment rendered against them in the suit.
It is undisputed that Patrick Viator was employed by Falcon as a floor hand/shaker hand on the Achilles, a jack-up rig in the Gulf of Mexico. Viator fell while he and the crew were inserting drill pipe into the well. Viator sued Falcon; its insurer, Liverpool; and Falrig, the owner of the Achilles, alleging injuries to his cervical spine.
After a trial on the merits, the trial judge rendered judgment against the defendants and in favor of Viator. The judge found that Viator was a Jones Act seaman, that he was injured while in furtherance of the mission of the jack-up rig, Achilles, and that Viator was injured because of the negligence of his employer and of the unseaworthiness of the rig. He further found that Viator was free from fault in the accident. The court awarded Viator $100,000.00 for past physical and mental pain and suffering, permanent disability and loss of enjoyment of life; $150,000.00 for future physical and mental pain and suffering, permanent disability and loss of enjoyment of life; $19,593.25 for past medical expenses; $55,586.00 for past lost income and $225,000.00 for future lost income/loss of earning capacity. The defendants appeal.

LIABILITY OF FALCON
Based on three arguments, the defendants assert that Falcon should not have been found liable for the injury to Viator.

1. Standard of Care

The defendants first argue that the trial judge's finding of liability was based on application of an incorrect standard of care. Defendants contend that the trial court found that the slightest negligence on the part of Falcon was sufficient to sustain a finding of negligence, and that the seaman's duty to protect himself is slight. Defendants assert that, under Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir.1997), both Falcon and Viator should be held to reasonably prudent behavior. The defendants argue that, because an inappropriate standard of care was applied, we should review the case de novo rather than under a manifest error standard of review. The plaintiff argues that Gautreaux is inapplicable because the decision was not handed down until sometime after the rendition of judgment in this case. The judgment and written reasons given by the trial judge in this case do not indicate the standard of care that he applied.
In Gautreaux, the court clarified the duty of care owed by an employer under the Jones Act:
The language chosen by Congress to determine the responsibility of both employers and employees under the Jones *491 Act is simple and direct. Nothing in the statute indicates Congress's intention to hold Jones Act employees to a standard of slight duty of care in the exercise of concern for their own safety. Below, we explain the statutory scheme and Supreme Court precedent interpreting it before we illustrate our departure from their clear mandates.
1. The Statutory Scheme and Supreme Court Precedent
Under the Jones Act, seamen are afforded rights parallel to those of railway employees under the Federal Employers' Liability Act ("FELA"). 46 U.S.C. § 688. Section 51 of the FELA provides, in pertinent part, that "[e]very common carrier by railroad ... shall be liable in damages ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51 (emphasis added). A seaman is entitled to recovery under the Jones Act, therefore, if his employer's negligence is the cause, in whole or in part, of his injury. In their earlier articulations of § 51 liability, courts had replaced the phrase "in whole or in part" with the adjective "slightest." In Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957), the Supreme Court used the term "slightest" to describe the reduced standard of causation between the employer's negligence and the employee's injury in FELA § 51 cases. In Ferguson v. Moore-McCormack Lines, Inc., 352 U.S. 521, 523, 77 S.Ct. 457, 458, 1 L.Ed.2d 511 (1957), the Court applied the same standard to a Jones Act case, writing, "`Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.'" (quoting Rogers, 352 U.S. at 506, 77 S.Ct. at 448).
Nothing in these cases, then, supports the proposition that the duty of care owed is slight. Rather, the phrase "in whole or in part" as set forth in the statute, or, as it has come to be known, "slightest," modifies only the causation prong of the inquiry. The phrase does not also modify the word "negligence." The duty of care owed, therefore, under normal rules of statutory construction, retains the usual and familiar definition of ordinary prudence.
Id. at 334-35.
The court in that case further clarified the seaman's duty of care, concluding that:
A seaman, then, is obligated under the Jones Act to act with ordinary prudence under the circumstances. The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education. The reasonable person standard, therefore, under the Jones Act becomes one of the reasonable seaman in like circumstances. To hold otherwise would unjustly reward unreasonable conduct and would fault seamen only for their gross negligence, which was not the contemplation of Congress.
Id. at 339.
Lacking any indication to the contrary, we will not assume that the trial court applied an incorrect standard. Therefore, we will not undertake a de novo review, but will review the record under a manifest error standard.

2. Competency of Edward Robert to Testify as an Expert.

Defendants seek to have this court disregard the testimony of the plaintiff's rig safety expert, Edward Robert, arguing he was not competent to testify as such. They argue that he did not have a sufficient background as a rig worker, and especially as a driller, to testify concerning the safe operation of drilling rigs by drillers.
The decision to qualify a witness as an expert is within the discretion of the trial court. A determination in this regard will not be disturbed on appeal lacking manifest error. Carpenter v. Lafayette Woodworks, Inc., 94-1011 (La.App. 3 Cir. 2/1/95); 653 So.2d 1187. "The trial court also has wide discretion to determine whether a question or subject falls within the scope of an expert's expertise." Mitchell v. Popiwchak, 95-1423 (La.App. 4 Cir. 6/26/96); 677 So.2d 1050, 1055.
*492 Robert testified that he has a bachelor of science degree in petroleum geology from Louisiana State University. He has further received additional training in rig safety through a variety of seminars and courses. He worked as a geologist for the State of Louisiana in the Department of Conservation. He was employed as a safety and training director for Mayronne Company. As such, he conducted and supervised weekly on-site rig inspections and accident investigations. He was responsible for compliance with government safety regulations and implemented safety training programs. Additionally, he was an instructor at Energy Training Group, conducting courses and seminars relating to oil field operations, equipment and safety for private industry at the University of New Orleans. He is currently self-employed as a safety consultant primarily in the offshore and onshore drilling and transportation industries. He has testified in many courts, both federal and state, as an expert in the field of oil field rig safety. In traversing Robert on his qualifications, the defense brought out that he has never actually worked as a driller. The defendants contend that this deficiency disqualifies him as an expert in rig safety. However, Falcon has hired him as a rig safety expert to render opinions as to the safety of one of its rigs. Given his extensive training and experience in the field of rig safety, we cannot say the trial judge abused his discretion in qualifying Robert as an expert in the field of oil rig safety and operations.

3. Falcon's negligence.

Falcon further argues that the evidence does not support the conclusion that negligence on the part of Falcon or one of its employees was a cause of the accident. As the Fifth Circuit indicated in Gautreaux, 107 F.3d 331, the Jones Act contains a liberal causation requirement. A seaman is entitled to recover if the employer's negligence played any part, even the slightest, in producing his injury. "Moreover, a trial court's factual findings in general maritime and Jones Act cases are reviewed under this state's manifest error standard of review. Milstead v. Diamond M Offshore, Inc., 95-2446, p. 11 (La.7/2/96); 676 So.2d 89, 96." Hollenbeck v. Oceaneering Intern., Inc., 96 0377 (La.App. 1 Cir. 11/8/96); 685 So.2d 163, 169.
It is undisputed that the accident happened while Viator was acting as a relief derrick hand on the Achilles. The driller was Donald Thornton. The crew was inserting drill pipe into the well. As derrick hand, it was Viator's duty to stand on the derrick, ninety to ninety-five feet above the drill floor, take the top end of a stand of pipe out of the fingers of the derrick and, using a rope as support, move the pipe to the center of the derrick. At the same time, the driller would lift the block and the drill pipe elevators. When the elevators reached him, Viator was to push the pipe into the elevators and latch the elevators around the pipe. The bottom end of the pipe would be lifted off the drill floor so that the floor hands could put the bottom end of the pipe in the appropriate place. Viator had been working as derrick hand for about forty-five minutes prior to the accident. In that time he had missed or been unable to latch the pipe into the elevators three times. Each of those times the pipe fell across the derrick. On the day of the accident, the driller, as was his usual practice, ran the block continuously, without stopping to allow the elevators to be latched. Viator took the end of one of the remaining stands of pipe and walked out to the end of the monkey board to move the top end of the pipe to the center of the derrick. His safety belt had become hooked on something. In getting it loose, he may have loosened its fit. The elevators rose to meet him. Viator attempted to shove the pipe into the elevators and latch the elevators. He was unable to close the latch. As the elevator continued to rise, the pipe began to fall. Viator grabbed the pipe to prevent it from falling across the derrick. He lost his balance and fell across the fingers. As a result, he injured his neck.
The parties dispute whether the accident occurred through improper operation of the rig or as a result of the negligence of Viator.
Viator testified that on the day of the accident, Thornton ran the block too fast for him. He had tripped about fifty stands of pipe before the accident. Of those, he had *493 missed three because the upward rise of the elevators was so fast that the elevators were over the top end of the pipe before he could grab the pipe to restrain it. Those three stands fell across the derrick. When pipe fell across the derrick, it would take from three to eight minutes to get back to him if all went well. He stated that the latches were stiff on the day of the accident. There was no intercom so he motioned a floor hand to grease the latch. However, the floor hand apparently did not hear him because the latches were not greased. He went to get a pipe from the fingers. Coming back to the front of the board, the rope to his safety belt got caught on a hook. He disentangled it and went out the remainder of the distance to the end of the board. As he stood ready, the block approached him. He made his final lean out to catch the block and noticed that he was able to lean out a bit further than usual. The block was coming very fast. He pushed the pipe into the elevator and slammed it shut. As the elevator went up, he saw that the latch was not closed so he grabbed the pipe with two hands to keep the pipe and himself from pulling off the left side of the board. As he stepped off the board onto the fingers to his left to brace himself, the pipe threw him off and he fell on his back on the fingers. He testified that he did not have time to signal the driller that the latch had not caught, that it was a split second decision to grab the pipe and that in another split second he had fallen. He admitted that it was his responsibility to make sure that his safety belt was the right length.
Allen Hebert was a floor hand on the Achilles at the time of Viator's accident. He has acted as a relief derrick hand. He testified that Thornton had a reputation for running the drill blocks fast and that in competitions for best crew, Thornton is the fastest. He stated that he has seen Thornton running the block so fast as to be unsafe. He further stated that a derrick hand can't tell the driller he is going too fast because the driller is in charge and, if he runs the block too fast, the derrick hand has to put up with it. He stated that when he is acting as relief derrick hand and the block is being run too fast for him, he just lets the block go by and the driller lowers it back into place so that he can latch the pipe. Hebert further testified that he was on the floor on the day of the accident and could hear the latch catch on every piece of pipe from his position.
Roddy Romero, a floor hand on the Achilles, testified that Thornton was faster than other drillers. He further testified that he felt that Thornton was going faster than usual on the day of the accident.
Edward Robert, the plaintiff's expert in the field of rig safety, testified that Viator acted the way a derrick hand in the industry should act in the performance of his duties and conformed to proper practice in the industry. He further testified that the driller did not act properly. Robert opined that the driller should have been able to hear the elevators latch. If he failed to hear this, he should have been alerted that there was a problem and stopped the elevators before they reached the end of the pipe. He stated that the driller should always be able to stop the upward rise of the elevator before the latches go past the end of the pipe because this is the only control over the pipe. He opined that in failing to maintain control of the upward rise of the elevator, Thornton failed to perform according to the minimum expectation in the industry for a driller. He stated that failing to maintain control of the upward rise of the elevator latch so as to allow it to go past the end of the pipe is recognized in the industry as posing a hazard for personal injury.
Ken Kaigler, also a safety expert, testified that he found nothing wrong with the way the rig was run. However, he also testified that he could not fault Viator for his actions.
Charles Singleton testified for the defendants as an oil field safety expert. He testified that the driller acted in accord with accepted oil field practices. He stated that he does not believe that the driller could have stopped the elevators before they reached the top of the pipe under the circumstances. He stated that a sudden stop will kink the line on the block. He opined that Viator placed himself at risk of injury by not letting go of the pipe sooner. However, he admitted that if the driller sees that a derrick hand is unable to secure the latch he *494 should try to stop the upward motion of the elevators if he can do it without backlashing the drill line. He further admitted that the Falcon safety manual says not to allow your employees to hurry up to the point of being unsafe.
In a trial where causation and credibility are major issues, a [trial judge's] findings of fact are entitled to great deference. Ambrose v. New Orleans Police Ambulance Service, 93-3099, 93-3110, 93-3112 (La.7/5/94); 639 So.2d 216; reh'g denied, 9/15/94. Those findings may not be overturned unless they are manifestly erroneous. Stobart v. State, 92-1328 (La.4/12/93); 617 So.2d 880. Moreover, when more than one competing view is permissible, as in this case, a fact finder's choice cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989), writ denied, 561 So.2d 105 (La.1990).
Before reversing a [fact finder's] conclusions of fact, an appellate court must satisfy a two step process based on the record as a whole: There must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong. Stobart v. State, 92-1328 (La.4/12/93); 617 So.2d 880; Weatherford v. Commercial Union Ins., 94-1793, 94-1927 (La.2/20/95); 650 So.2d 763.
Guillory v. Insurance Company of North America, 96-1084, p. 5 (La.4/8/97); 692 So.2d 1029.
After reviewing the testimony with regard to the fault of Falcon, we find that it supplies a reasonable factual basis for the trial court's conclusions. Further, the finding does not appear to be clearly wrong. Accordingly, we will not overturn the trial court's conclusion that Falcon was at fault in the injury to Viator.

UNSEAWORTHINESS
The defendants next allege that the trial court erred in finding that the Achilles was unseaworthy.
To be seaworthy, a vessel and its appurtenances must be reasonably suited for the purpose or use for which they were intended. A vessel owner's duty to furnish a seaworthy ship is absolute and completely independent of the duty under the Jones Act to exercise reasonable care. To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing injury and that the injury was either a direct result or reasonably probable consequence of unseaworthiness. Johnson v. Offshore Exp., Inc., 845 F.2d 1347 (5th Cir.1988).
Cormier v. Cliff's Drilling Co., 93-1260, p. 4 (La.App. 3 Cir. 5/4/94); 640 So.2d 552, 555. A vessel crew engaging in unsafe work methods can constitute unseaworthiness. Phillips v. Western Co. of North America, 953 F.2d 923 (5th Cir.1992).
"A factual finding of unseaworthiness by the trier of fact is reviewed under the clearly erroneous standard." Foster v. Destin Trading Corp., 95-226 (La.App. 5 Cir. 2/27/96); 670 So.2d 1342, 1347 (citations omitted).
The record contains support for the conclusion that the crew of the Achilles engaged in unsafe work practices. Additionally, there is testimony to support the conclusion that the failure to have an intercom system between the driller and the derrick hand was unsafe and an unseaworthy condition. Accordingly, we will not disturb the trial court's finding that the Achilles was unseaworthy.

COMPARATIVE NEGLIGENCE OF VIATOR
The defendants argue that the trial court erred in finding Viator free from fault. Defendants argue that the accident resulted solely from the plaintiff's negligence. However, we have already found that the trial judge did not err in finding the defendants at fault in the accident. Therefore, although the defendants have not argued the issue, we will review the record to determine whether Viator was comparatively negligent and should be assessed with a portion of the fault.
"The determination and allocation of fault are subject to the manifest errorclearly wrong standard of review." Adkinson v. Brookshire Grocery Co., Inc., 95-1021, p. 4 *495 (La.App. 3 Cir. 1/31/96); 670 So.2d 453, 456 (citations omitted). Therefore, we will consider whether the record provides reasonable support for the trial court's determination that Viator was completely without fault in the accident as well as whether the determination was clearly wrong. Guillory, 96-1084.
Singletary testified that Viator placed himself at risk of injury by not letting go of the pipe sooner. Thornton, however, testified that he thinks Viator did the right thing to grab the pipe. Kaigler testified that he could not fault Viator's conduct. Robert stated that Viator's conduct conformed to the proper practice in the industry. Having reviewed the entirety of the testimony and evidence on the issue, we conclude that there is sufficient evidence in the record to support the trial court's conclusion that Viator was not at fault in the accident. Further, we find no clear error in this conclusion. Therefore, the trial court's determination in this regard will not be overturned.

QUANTUM
The defendants argue that excessive damages were awarded for past and future pain and suffering, for future loss of income and/or earning capacity. The defendants also argue that the plaintiff's condition did not warrant the surgery which was performed.

1. Need for Surgery.

Although the defendants did not assign error in this regard and do not specifically so argue, we assume they wish to have the award for medical expenses reduced for this reason. After reviewing the record, we conclude that the surgery was, in fact, medically necessary. The testimony of the various physicians who treated Viator is conflicting concerning Viator's need for surgery. However, the record shows that Viator's condition improved as a result of the surgery. There is nothing of record to suggest that his condition would have improved equivalently without the surgery. This, in combination with the conflicting testimony, is enough to support the conclusion that the surgery was necessary. Therefore, we find no error in the trial judge's conclusion that the surgery was necessary.

2. Past and Future Pain and Suffering.

The supreme court in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993) explained the appropriate standard of review applicable to general damage awards:
In Reck v. Stevens, 373 So.2d 498 (La. 1979), this Court commented on appellate review of general damage awards and on the "much discretion" in fixing damages accorded to trial courts by La.Civ.Code art.1934(3)(1870). The decision pointed out that the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
In Reck, this court disapproved the appellate court's simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, *496 Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La. 1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La.1974).
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Id. at 1260-61 (footnote omitted).
Viator was injured on November 1, 1993. On November 16, 1993, he saw Dr. Clifton Shepard, an orthopedic surgeon. Viator complained of neck, shoulder and back pain, as well as headaches. Based on the complaints, Dr. Shepard assumed Viator had a cervical and upper thoracic strain. He recommended medication and physical therapy. He continued to treat Viator until February 1994.
Dr. Ricardo Leoni treated Viator for headache and neck and low back pain through January 1994. Viator also underwent physical therapy. However, it exacerbated his condition.
Viator was next treated by Dr. John Cobb. In April 1995, Dr. Cobb performed surgery on Viator to fuse his spine at the C5-6 level. He last saw Viator on March 11, 1996. Viator had reached maximum medical improvement. Dr. Cobb opined that Viator would have occasional pain for the rest of his life. He further rated Viator's residual disability as a 12% to 14% impairment of the body as a whole.
Viator testified that the pain from the injury was relieved only by the surgery. He further testified that prior to the accident he lifted weights, fished and hunted regularly. He hunted two or three times between the accident and the surgery. Before the surgery his family helped him with household chores and meals. He was unable to drive at all for three months after the surgery. He states that he still has pain in his neck about twice a week. He is still restricted from crawling, climbing, heavy lifting, and boat riding. He cannot sit for long periods.
Considering the circumstances, we cannot say that the general damage award constitutes an abuse of the trial judge's discretion.

3. Future Lost Wages/Loss of Earning Capacity.

The defendants next argue that the award of $225,000.00 in future lost wages and/or loss of earning capacity was excessive.
The manifest error rule governs the review of awards for loss of earning capacity. Detraz v. Hartford Accident & Indemnity Co., 94-708 (La.App. 3 Cir. 12/7/94); 647 So.2d 576. The appellate question is not whether a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record. Id.

Samuel B. Trahan v. Savage Industries, Inc., 96-1239, p. 10 (La.App. 3 Cir. 3/5/97); 692 So.2d 490.
Here, Kenneth Boudreaux, the defendant's expert economist, testified that if the plaintiff were employed in the future at minimum wage, he would have a loss of earnings or earning capacity of $212,248.41. He further testified that if Viator were employed at a middle range wage, his loss would be $161,417.00. In reaching his figures, Boudreaux relied on the Camus study of work life expectancy of oil field workers.
The plaintiff's expert economist, Douglas Womack, disputed the Boudreaux's figures. He felt that reliance on the Camus study *497 rendered Boudreaux's conclusions inaccurate. He stated that the Camus study was not statistically reliable for calculating work-life expectancy. He stated that it was never published and not subjected to peer review. Further, he stated that the sample used was insufficient to be statistically accurate: the study included only nine companies in the central Gulf Coast region during three years when the oil industry was in decline. Further, he felt the study was inaccurate because it assumed that everyone leaving any one of the nine companies studied during the three year period left oil field work completely. Boudreaux admitted that if there is an income earning ability that is affected beyond the offshore work life then the regular work-life tables must be used as the total loss period.
Womack calculated the loss of wages or earning capacity at $469,593.00 if Viator returned to work at $5.00 per hour; $452,116.00 at $5.50 per hour; $449,855.00 at $7.00 per hour; and $344,784.00 at $7.50 per hour. He projected a higher inflation rate over the next twenty-five years than did the defendant's expert. Further, he included a higher figure for loss of fringe benefits.
The defendants' rehabilitation expert, Denise Perry, opined that the plaintiff could earn in excess of $7.00 per hour at jobs available to him in the local market or for which he could be trained. Glenn Hebert, a rehabilitation consultant who testified for the plaintiff, testified that many of the job possibilities put forward by Perry were either not within the limitations imposed on Viator by his doctor or required training which did not interest Viator. He felt that it set a person up for failure to force him to attempt training that did not interest them. Hebert opined that if Viator remains in New Iberia, where he now lives, he will most likely earn wages of approximately $5.50 per hour and that if he goes to Lafayette he might earn $6.00 per hour.
Considering the entirety of the evidence of record, we find that the award of $225,000.00 for future lost wages/loss of earning capacity had adequate evidentiary support. We cannot say that the award was clearly wrong. Therefore, the award will not be overturned.

EXPERT WITNESS FEES
Finally, the defendants argue that the trial court erred by setting excessive fees for the plaintiff's experts.
The fixing of expert witness fees is largely within the sound discretion of the trial court, and, on appeal, we may not reverse the trial court's fixing thereof absent an abuse of discretion. In fixing expert witness fees, each case must turn on its own peculiar facts and circumstances. However, the jurisprudence has provided us with factors to consider such as the amount of time consumed by the experts in compiling their reports; the amount charged [for the services]; the amount of time spent in preparing for trial; the amount of time actually spent in court; the expertise of the expert; ... the amount involved in the award; and the degree to which the expert's opinion aided the court in its decision.
Trans Louisiana, Gas Co. v. Heard, 629 So.2d 500, 505 (La.App. 3 Cir.1993).
In this case the trial court awarded $2,000.00 to Dr. Cobb, $1,000.00 to Dr. LaBorde, $1,962.00 to Dr. Womack, and $2,500.00 to Glenn Hebert, Inc. While these fees are high, we cannot say they are excessive, given the time consumed compiling reports, preparing for testimony, and in actually testifying regarding the relevance of their testimonies to the various disputed points before the court and the amount of the award herein. Therefore, the fee awards will not be overturned.

CONCLUSION
For these reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to the defendants.
AFFIRMED.
AMY, J., concurs in the result.