779 So.2d 1014 (2001)
Marcia H. DALME
v.
BLOCKERS MANUFACTURED HOMES, INC. et al.
No. 00 00244-CA.
Court of Appeal of Louisiana, Third Circuit.
January 25, 2001.
Rehearing Denied March 28, 2001.
*1016 E. Joseph Bleich, Ruston, LA, Counsel for Blockers Manufactured Homes, Inc.
Walter Kay Jamison III, Walter K. Jamison, Ltd., Lafayette, LA, Counsel for Cappaert Manufactured Housing, Inc.
Chatham Hurst Reed, Simon, Fitzgerald, Cooke, et al., Shreveport, LA, Counsel for Blockers Manufactured Homes, Inc.
Charles Raymond Whitehead Jr., Whitehead Law Offices, Natchitoches, LA, Counsel for Marcia H. Dalme.
Marjorie Briley Breaux, Walter K. Jamison, Ltd, Lafayette, LA, Counsel for Cappaert Manufactured Housing, Inc.
Court composed of DOUCET, YELVERTON, THIBODEAUX, COOKS, SAUNDERS, WOODARD, DECUIR, PETERS, AMY, SULLIVAN, GREMILLION, and PICKETT, Judges.
EN BANC.
SAUNDERS, Judge.
Ms. Marcia Dalme purchased a mobile home with multiple defects. She filed suit in redhibition against the manufacturer and the seller of the mobile home seeking recission of the sale. The trial court found in favor of Ms. Dalme and against the builder. The trial court did not assess the seller with any liability. We affirm as amended.

FACTS
Cappaert Manufactured Housing (Cappaert) manufactured the mobile home in Vicksburg, Mississippi. The home was then transported across the state line and placed on a Blockers Mobile Homes' (Blockers) sales lot in Natchitoches, Louisiana. Blockers displayed the mobile home in Natchitoches for approximately fourteen months. Ms. Dalme purchased the home from Blockers on February 4, 1998. Blockers then transported and mounted Ms. Dalme's home at her chosen location. Immediately thereafter, Ms. Dalme began experiencing problems. Both Blockers and Cappaert attempted to repair some of the problems; however, several problems persisted, including "roof rumble," soft spots on the linoleum flooring, plumbing complaints, and a crooked chimney.
Ms. Dalme filed suit in redhibition against Blockers and Cappaert seeking recission of the sale and attorney fees. The trial court granted judgment in favor of Ms. Dalme against Cappaert finding that the defects originated with the manufacturer. The trial court did not assess any liability against Blockers. Cappaert then appealed to this court seeking a reversal of the trial court.

*1017 LAW AND ANALYSIS

On appeal, Cappaert asserts the following assignments of error:
1. The trial court erred in finding that Ms. Dalme was entitled to relief in light of the New Home Warranty Act.
2. The trial court erred in finding that Ms. Dalme was entitled to relief in redhibition because she did not present expert testimony regarding violations of the Code.
3. The trial court erred in its assessment of damages against Cappaert.
Although Ms. Dalme also appealed, contesting the finding of no liability on the part of Blockers, Ms. Dalme's appeal is subject to a stay order issued in connection with a federal bankruptcy proceeding involving Blockers'.[1] In light of this automatic stay, our consideration is limited to Cappaert's appeal.

APPLICABILITY OF THE NEW HOME WARRANTY ACT
In its first assignment of error, Cappaert alleges that the trial court erred in entering judgment against it in light of the New Home Warranty Act, La.R.S. 9:3141, et seq. Cappaert contends that this provision is a mobile home owner's exclusive remedy against a manufacturer and that the provision requires proof of building standards applicable to the home's construction. Because Ms. Dalme presented no evidence of applicable building standards, Cappaert contends that Ms. Dalme failed to establish a prima facie case under the New Home Warranty Act.

STATUTORY INTERPRETATION
This court has had several opportunities to consider the applicability and scope of the New Home Warranty Act (NHWA), found at La.R.S. 9:3141 et seq., with respect to mobile homes.
Our court has concluded that the NHWA applies to mobile homes. See Sonnier v. Bayou State Mobile Homes, Inc. 96-1458 (La.App. 3 Cir. 4/2/97), 692 So.2d 698, writ denied, 97-1575 (La.10/3/97), 701 So.2d 201. We are now convinced, nevertheless, that the Legislature did not intend such a result. Where a statute is ambiguous or susceptible of two reasonable interpretations, statutory interpretation is necessary. In re Louisiana Health Serv. and Indem. Co. 98-3034 (La.10/19/99), 749 So.2d 610. The meaning of ambiguous words must be sought by examining the context in which they occur and the text of the law as a whole. See West Monroe Police Local 135 v. Norris, 31,183 (La.App. 2 Cir. 10/28/98); 720 So.2d 434, writ denied, 99-0035 (La.2/12/99), 738 So.2d 582. Judicial statutory interpretation must give consideration and meaning to an entire statutory framework and context. Bourgeois v. Akzo Nobel Salt, Inc., 97-54, (La.App. 3 Cir. 10/01/97), 702 So.2d 762, writ denied, 97-2753 (La.2/6/98), 709 So.2d 732. The language of the NHWA is ambiguous. The language does not expressly include mobile homes. The statute could be read as including mobile homes or excluding mobile homes. The more reasonable reading of the statute is one in which the act would apply only to new homes built on-site, rather than mobile homes constructed by manufacturers, which through the channels of interstate commerce incidentally become located in our state.
First, the language used by our legislature in setting forth the purpose of the act suggests that the legislature intended to *1018 limit its scope to new homes built on-site. "When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to purpose of the law." La.Civ. Code art. 10; See Louisiana Smoked Prods., Inc. v. Savoie's Sausage and Food Prods., Inc., 96-1716 (La.7/1/91), 696 So.2d 1373. The Louisiana Legislature has expressed its purpose in enacting the NHWA at La.R.S. 9:3141. La.R.S. 9:3141 states:
The legislature finds a need to promote commerce in Louisiana by providing clear, concise, and mandatory warranties for the purchasers and occupants of new homes in Louisiana and by providing for the use of homeowners' insurance as additional protection for the public against defects in the construction of new homes. This need can be met by providing a warranty for a new home purchaser defining the responsibility of the builder to that purchaser and subsequent purchasers during the warranty periods provided herein. The warranty, which is mandatory in most cases, shall apply whether or not building code regulations are in effect in the location of the structure, thereby promoting uniformity of defined building standards. Additionally, all provisions of this Chapter shall apply to any defect although there is no building standard directly regulating the defective workmanship or materials.
In this statement of purpose, the legislature anticipates that the statutory warranty outlined in the act will be applied to builders and to occupants of new homes. In addition, the statement of purpose provides that the warranty will be applied whether or not building codes are in effect at the location of the structure and will be applied regardless of whether any building standards relate directly to the defective workmanship or materials that the warranty covers. The legislature's repeated reference to "building codes" and "building standards" in this act's statement of purpose indicates that the legislature intended this legislation to apply to homes built onsite. Only homes built on-site are typically covered by such "building standards" or "building codes." Mobile homes are covered, in contrast, by legislation specifically providing for the standards by which they are to be built, not by "building standards" and "building codes." See La.R.S. 51:911.23. The language used by the legislature in the statement of purpose indicates that the statute should be applied only to homes capable of being regulated by "building standards" or "building codes," even if these homes are not currently regulated by them. The only new homes susceptible of such regulation are homes that are built on-site, not mobile homes.
In addition, the legislature defined several terms narrowly, so as to exclude the possibility that the NHWA covers mobile homes. First, the definition of "builder" does not appear broad enough to encompass the manufacturer of a mobile home. "Builder" is defined as, "any person, corporation, partnership, limited liability company, joint venture, or other entity which constructs a home, or addition thereto, including a home initially occupied by a builder as his residence ..." La.R.S. 9:3143(1). Manufacturer, the term used to describe one who constructs mobile homes, is conspicuously absent from the NHWA. See generally La.R.S. 51:911.22(5) (provides definition of manufacturer). The dissimilarity between the builder of a home and the manufacturer of a mobile home is apparent when one considers the difference between the processes used by a builder to construct a home and a manufacturer to produce a mobile home. Second, the term "home," as defined by the statute, and in the context of the statute as a whole, seems to refer only to those homes built on-site. "Home" is defined as, "any new structure designated and used only for residential use, together with all attached and unattached structures, constructed by the builder whether or not the land was purchased by the builder. Such term includes structures containing multiple family dwellings or residences." La. *1019 R.S. 9:3143(3). (Emphasis added.) In the NHWA, the clear meaning of "include" is an expansion of the word "home" to encompass multiple family dwellings or residences, e.g., apartment complexes. The legislature knew that a "multiple family dwelling" may not have been understood to be a "home" under the NHWA so the legislature included it in its definition of "home" to insure coverage. The legislature did not state that the term "mobile home" was included as a "home" even though a mobile home may not be understood to be a "home" in this context. The fact that the legislature did not specifically state that mobile homes were included under the definition of "home," although it took care to note that "multiple family dwellings" were included, is strong evidence that the legislature intended the act to exclude mobile homes.
Third, the warranty provisions of the act provide, "[a]fter the first year, the concrete floor of a basement and the concrete floor of an attached or unattached garage that is built separate from a foundation wall or other structural element of the home." La.R.S. 9:3144(2). The statute also makes extensive reference to "building standards". "Building standards" are defined in the act as:
[S]tandards contained in the building code, mechanical-plumbing code, and electrical code in the parish, city, or other local political subdivision where a home is to be located, at the time construction of that home is commenced, or, if the parish, city, or other local subdivision has not adopted such codes, the Standard Building Code, together with any additional performance standards, if any, which the builder may undertake in to be in compliance.
La.R.S. 9:3143(2). The items listed as covered under the statutory warranty and the legislature's reliance in the statute on local building standards are indications that the drafters of this legislation considered a home as something which would be permanently situated in one place, rather than something susceptible of movement from place to place. To be certain, it would be difficult, if not impossible, to apply local building standards to a mobile home built in another state and then installed in a parish of this state.
Furthermore, the legislative history of the NHWA indicates that the Louisiana Legislature intended the scope of the act to be limited to new homes built onsite. A court may look to the legislative history of a statute to discern the intent of the legislature in enacting that statute. See Roberts v. State Farm Mut. Auto. Ins. Co., 27,501 (La.App. 2 Cir. 11/1/95), 662 So.2d 821. In the Louisiana Senate and House, the discussion of the NHWA clearly indicated that the purpose of the act was to provide the exclusive warranties of residential home builders to owners of newly constructed homes.[2] Legislators are presumed to pass laws with deliberation and with full knowledge of all existing laws on the same subject. Theriot v. Midland Risk Ins. Co., 95-2895 (La.5/20/97), 694 *1020 So.2d 184. The legislators, who referred to "residential home builders" when presenting the act, likely knew that the term had been previously defined to exclude those who manufactured mobile homes. La.R.S. 37:2150.1 provides:
(9) "Residential building contractor" means any corporation, partnership, or individual who constructs a fixed building or structure for sale for use by another as a residence or who, for a price, commission, fee, wage, or other compensation, undertakes or offers to undertake the construction, or superintending of the construction of any building or structure which is not more than three floors in height, to be used by another as a residence, when the cost of the undertaking exceeds fifty thousand dollars. The term "residential building contractor" includes all contractors, subcontractors, architects, and engineers who receive an additional fee for the employment or direction of labor, or any other work beyond the normal architectural or engineering services. It shall not include the manufactured housing industry or those persons engaged in building residential structures that are mounted on metal chassis and wheels.

(Emphasis added.) Thus, an examination of the legislative history bolsters the conclusion that the legislature intended the NHWA to apply only to those residences built on-site and not those applicable to mobile homes.

LOUISIANA UNIFORM STANDARDS CODE
If we would find the NHWA to apply to mobile homes as Cappaert suggests, the NHWA would have to be harmonized with other legislation dealing with mobile homes, specifically the Louisiana Uniform Standard's Code for Mobile Homes and Manufactured Housing (USCMH). La. R.S. 51:911.21, et seq.[3] La.Civ.Code art. 13 provides that "laws on the same subject must be interpreted in reference to each other."
Our court addressed briefly the compatibility of the NHWA and the USCMH in Turner v. Fleetwood Homes of Alabama, Inc., 97-1510 (La.App. 3 Cir. 4/1/98), 711 So.2d 742. In Turner, this court found that the NHWA and the USCMH could be harmonized. Id. In that instance, the purchasers of a mobile home, the Turners, brought suit against the manufacturer of their mobile home, Fleetwood Homes of Alabama, Inc. (Fleetwood) and North River Homes, Inc. (North), a division of Fleetwood. Id. At trial, a default judgment was entered against the defendants, Fleetwood and North. Id. The defendants appealed alleging, among other things, that the NHWA governed the Turners' action, and the Turners had failed to introduce sufficient competent evidence to maintain an action under that act. Id. In response, the Turners argued that La.R.S. 51:911.25 provided additional warranties for mobile or manufactured homes. Id. In reviewing the two statutes, the court found that they could be harmonized. The court concluded that while the NHWA applied to the sales of all new homes, the USCMH provided additional warranties to the purchasers of mobile or manufactured homes. Id. The court; however, did not explore the coverage of the acts' warranty provisions as it found that the evidence presented by the Turners at trial had not been sufficient to establish a prima facie case under either statute. Id.
Cappaert, in arguing that the NHWA provides the exclusive remedy in this instance, failed to take into consideration our court's decision in Turner as well *1021 as the other statutes, such as the USCMH, which deal specifically with mobile homes. To determine the meaning and intent of a particular provision within a statute, the court must consider the entirety of the statute and other laws on same subject matter. Owen v. Department of Pub. Safety and Corr., 25,402 (La.App. 2 Cir. 1/19/94), 631 So.2d 32. A court interpreting a law presumes that the legislature enacted that law with deliberation and with full knowledge of all existing laws on the same subject. See Nunnally v. Department of Pub. Safety and Corr., 95-356 (La.App. 3 Cir. 10/4/95), 663 So.2d 254. In the instant case, an examination of Ms. Dalme's action in redhibition would not be complete without considering the other laws in effect which deal specifically with mobile home warranties. The USCMH, located at La.R.S. 51:911.25, provides:
A. Each new manufactured home manufactured after January 1, 1975, which is sold by a manufactured home dealer licensed by this state shall be covered by warranties of the manufacturer thereof, which warranties shall protect only the first retail purchaser of the manufactured home, for a period of one year from the date of the purchase, in accordance with the terms of the warranty hereinafter specified.
B. Each such manufactured home sold by a dealer licensed by this state shall be covered by written warranties which shall be furnished by the manufacturer and the dealer, which shall obligate them to warrant as a minimum, the following:
(1) Compliance with standards. The manufacturer shall warrant that the manufactured home complied with the Code and the requirements of this Part in effect at the time that the manufactured home was manufactured.
(2) Defects. The manufacturer shall warrant that the manufactured home was manufactured free from any defects in materials or workmanship and was delivered to the dealer in such condition. Neither the manufacturer nor the dealer shall be liable under the warranty for any defect in the manufactured home which is the result of improper setup, moving, defects in work or materials done or furnished by persons other than the manufacturer or dealer, unless such setup, moving, work, or materials were done or furnished by a person under contract with, or connected by agency with such manufacturer or dealer.
C. The warranty required by this Part shall be in addition to and not in derogation of any other warranties, rights, and privileges which the buyer may have under any other law or instrument. The buyer may not waive his rights under this Part and any such waiver is hereby prohibited as contrary to public policy and shall be unenforceable and void.
(Emphasis added.) Applying the court's analysis in Turner, Ms. Dalme is entitled to remedies under the NHWA as well as the USCMH. The language of La.R.S. 51:911.25(C), which provides that the warranties under USCMH are not exclusive and are additional to other warranties provided by law or instrument, buttresses this conclusion.

EXCLUSIVITY
Despite this court's holding in Turner, we now find that the application of the NHWA to mobile homes creates a serious and irreconcilable conflict in the law, if not an implied repeal of the USCMH. The problem lies with the scope of the NHWA's exclusivity provision. The applicable section of the NHWA, La.R.S. 9:3150 provides:
This Chapter provides the exclusive remedies, warranties, and prescriptive periods as between builder and owner relative to home construction and no other provisions of law relative to warranties and redhibitory vices and defects shall apply. Nothing herein shall be construed as affecting or limiting any *1022 warranty of title to land or improvements.
Because of this provision, the NHWA and the USCMH can not be harmonized as this court suggested in Turner. The USCMH stands as a fortress in opposition to the notion that mobile homes are included within the NHWA. There are only two reasonable ways to read these statutes together. Either the NHWA, through its exclusivity provision, repeals the entirety of the USCMH, or the NHWA must be read not to apply to mobile homes. "A repeal by implication is not favored. Liter v. City of Baton Rouge, 258 La. 175, 245 So.2d 398, 402 (1971). The legislature is presumed to intend to achieve a consistent body of law. State v. Piazza, 596 So.2d 817, 819 (La.1992), reh. granted in part on other grounds." Roby v. Bd. of Trustees of Employees' Retirement Sys. of City New Orleans, 94-0671, p. 3 (La.App. 4 Cir. 1/31/95), 650 So.2d 811, 813. Applying these general principles to the instant case, it is unreasonable to assume that the legislature would have acted to repeal the entire statutory scheme created to deal with mobile homes through its enactment of the NHWA. Yet, we would have to make this assumption if we applied the NHWA as the exclusive remedy between the manufacturer of a mobile home and its purchaser. The legislature is presumed to intend to achieve a consistent body of law. It is reasonable to assume that since the legislature had previously passed extensive legislation to deal with mobile homes, the USCMH, that it would seek to pass equally extensive legislation devoted to new home construction. However, it is not reasonable to assume that this new legislation, the NHWA, would repeal the previous framework created by the legislature to deal with the manufacture of mobile homes, particularly when one notes that mobile homes are never expressly mentioned in the statute.
Furthermore, when statutes are in conflict, the statute which is more specifically directed to the matter prevails as an exception to the general statute. Esteve v. Allstate Ins. Co., 351 So.2d 117(La.1977); Roby, 94-0671, 650 So.2d 811. Here, it seems almost absurd to contend that a statute which specifically deals with new home construction, but at best could only peripherally be applied to mobile homes, would replace the USCMH as the primary source of remedies for purchasers of mobile homes. The NHWA simply does not provide the depth of coverage that the USCMH provides with respect to mobile homes.
The depth and completeness of the USCMH in its coverage of mobile homes is evident upon examination of the statute's provisions. The legislature defined the purpose of the USCMH as:
B. The legislature hereby declares that it finds that mobile homes and manufactured housing, because of the manner of their construction, assembly, and use and that of their systems, components, and appliances including heating, plumbing, electrical, and mechanical systems, like other finished products having concealed vital parts, may present hazards to the life and safety of persons and to the safety of property, unless properly manufactured. Furthermore, in the sale of mobile homes and manufactured housing, there is the possibility of the existence of defects that are not readily ascertainable when inspected by purchasers. It is the policy and purpose of this state to provide protection to the public against those possible hazards, and for that purpose to forbid the manufacture and sale of new mobile homes and manufactured housing which are not constructed so as to provide reasonable safety and protection to persons and property, and to provide product warranty and licensing requirements for manufacturers, dealers, and salesmen.
Here, unlike the NHWA, this statute clearly states that its purpose is to protect consumers from hazards that result when mobile homes are not properly manufactured. To accomplish this end, the statement *1023 of purpose asserts that the legislature will forbid the manufacture and sale of homes which are not properly constructed and will provide product warranty and licensing requirements.
The USCMH also provides for the establishment of a uniform standards code. See La.R.S. 51:911.23[4]. The USCMH defines the coverage of the Code as dealing with all body and frame design, construction requirements, and plumbing, heating, and electrical systems in mobile homes and manufactured housing. La.R.S. 51:911.23(A). The USCMH also provides a detailed framework through which to adopt and amend the Code. See La.R.S. 51:911.23(B). In addition, the USCMH provides licensing requirements for manufacturers, dealers, and salesman of mobile homes and manufactured housing. See 51:911.24. Finally, extensive installation standards for mobile homes and manufactured housing are supplied within the USCMH itself. See La.R.S. 51:912.22-912.28. For example, La.R.S. 51:912.22 provides:
All manufactured home and mobile home installations shall meet the following standards, unless otherwise specified in this Part:
(1) Installation standards for the setup of new or used instructions, if available. In the absence of the manufacturer's installation instructions, used manufactured homes and mobile homes shall comply with the provisions of this Part.
(3) All anchors, piers, and tie-down components used in the installation of manufactured homes and mobile homes shall be tested and meet the minimum industry standards. Installation of such anchors and components shall be in accordance with the manufacturer's instructions.
(4) As to site preparation, the under-home grade, or ground, shall be cleaned of all vegetation and organic material, such as stumps, roots, etc., except grass not exceeding three inches in height. The area beneath and around the home shall be sloped or properly drained so that water will not accumulate under the home. All grass and organic material shall be removed and the pier foundation placed on stable soil or compacted fill. When the soil compaction or soil-bearing capacity is not known, the local building authority in the locale may be consulted or a reading by the use of a pocket pentromenter may be obtained. The bottom of the footer or footers shall be placed on stable soil. The pier foundation shall be a minimum of three and one-half inches by sixteen inches by sixteen inches solid concrete pad or equivalent, precast or poured in place, or approved material. Where the manufacturer's specifications have additional requirements other than the above, the more stringent shall apply. The landowner shall be responsible for proper site preparation in accordance with this Paragraph.
(5) All manufactured homes and mobile homes shall be anchored with approved auger anchors installed to a minimum depth of thirty inches, or two and one-half feet, in undisturbed or compacted soil. Piers are to be installed off center of the anchors so as not to interfere with the proper alignment of the strapping. Anchors may be installed in predrilled holes provided the anchor penetrates a minimum of two feet into undisturbed soil beyond the predrilled hole. When the anchor manufacturer's installation instructions permit, the hole is then backfilled with soil compacted in layers not exceeding six inches. For manufactured homes produced after July 13, 1994, the installer shall refer to the manufacturer's setup manual for the ultimate load requirements for anchors *1024 at the different tie points on the manufactured home. For used manufactured homes when the manufacturer's setup manual is not available, all anchor points at side walls, shear walls, end walls, center line, and other points as identified by the manufacturer, shall be certified for an ultimate load of four thousand seven hundred twenty-five pounds. Anchors are required one at each end of shear walls; one on each end of each Ibeam; one frame tie at each vertical tie point; one in each end of each marriage wall, center line; and on each ridge beam support post.
(6) Frame tie ground anchors shall have approved stabilizing plates installed on the inside, in the direction of pull, with the top of the stabilizing plate driven flush with the soil unless otherwise specified by the manufacturer's guidelines.
(7) Piers or load-bearing supports or devices shall be installed and constructed to evenly distribute the loads. Steel piers with mechanical adjustments shall be securely attached to the frame of all manufactured homes and mobile homes. Manufactured load-bearing supports or devices shall be listed and approved for the use intended, or piers shall be constructed as outlined in this Part. Concrete products shall comply with the minimum dimensional and structural requirements for load-bearing. Solid and cell concrete blocks shall be to the standard specification for load-bearing concrete masonry units, ASTM C - 90, 1993 Edition. Poured concrete shall be a minimum of FCL = 2500 PSI. All plastic products shall be conditioned at ASTM D 618-61, reapproved 1990, standard practice for conditioning plastics and electrical insulating materials for testing. Plastics shall be tested to the ASTM D 790-92 standard test methods for flexural properties or unreinforced and reinforced plastics and electrical insulating materials, ASTM D 732-85 standard test method for shear strength or plastics by punch tool, and ASTM G 53-88 standard practice for operating light and water exposure apparatus for exposure of nonmetallic materials.
(8) In flood-prone areas, the foundation shall comply with the requirements set forth in the manual, Manufactured Home Installation In Flood Hazard Areas, published by the Federal Emergency Management Agency (FEMA).
The thoroughness of the USMCH, with its provisions for a uniform standards code, the licensure of manufacturers, dealers, and salesman, and its inclusion of a host of regulations concerning manufactured and mobile home installation, indicate that the legislature intended mobile homes to be subject to strict regulation and standards specifically tailored to their nature. The legislature's attention to detail with regards to this statute buttresses the conclusion that the USMCH, not the NHWA, determines what rights and warranties a purchaser of a mobile home has against its manufacturer. Under the USMCH, actions in redhibition, such as the action brought by Ms. Dalme, are allowed.

JURISPRUDENCE
Although we are the first court to recognize that the NHWA does not apply to mobile homes, prior jurisprudence in this area supports a narrow application of the statute. This circuit has recognized that the NHWA is only exclusive as between the owner and the builder. See Coussan v. Jim Tatman's Mobile Homes, Inc., 99-956 (La.App. 3 Cir. 12/15/99), 755 So.2d 293; Squyres v. Nationwide Hous. Sys., Inc., 98-8 (La.App. 3 Cir. 6/3/98), 715 So.2d 538. In actions against the seller of a new home, this court has determined that purchasers may seek remedies other than those provided for under the NHWA. Squyres, 98-8, 715 So.2d 538. For example, in Squyres, this court determined that purchasers had stated a cause of action in their petition because they could seek redress against their vendor under the *1025 USCMH or any other applicable theory of recovery, rather than proceeding solely under the NHWA. Id. In addition, in Coussan, this court allowed the purchaser to bring an action in redhibition against the seller of a manufactured home. Coussan 99-956, 755 So.2d 293.
Other circuits have taken a more narrow approach to the exclusivity provision of the NHWA, concluding that it does not prohibit all actions outside of the statute between the builder of a home and its purchaser. For example in Leon v. Deters Custom Homes, Inc., 97-0772 (La.App. 1 Cir. 4/8/98), 711 So.2d 346, the first circuit allowed the purchasers of a new home to bring an action in redhibition against the builder of their home. In that instance, the drainage problems the purchasers complained of resulted from the builder's construction of other homes on the property surrounding the purchasers' new home. Id. The court reasoned that the NHWA was not the exclusive remedy available to such purchasers where the problems complained of stemmed from the builder's actions outside of the construction of their home. Id.
Additionally, the first circuit, in Melancon v. Sunshine Constr., Inc., 97-1167 (La. App. 1 Cir. 5/15/98), 712 So.2d 1011, found the fact that the parties are a "builder" and "owners" of a home does not establish that the NHWA is the only remedy available to resolve issues regarding the defects in a home. In Melancon, the problems with the home's flooring arose after the builder had completed its construction, but before the builder had completed the sale. Id. The problems were the result of vandalism. Id. The first circuit concluded that since the defect was unrelated to the builder's actions, and since the condition of the floors was not a defect in construction under the NHWA, the purchasers were not limited to remedies available under the NHWA. Id.
Finally, the second circuit in Thorn v. Caskey, 32-310 (La.App. 2 Cir. 9/22/99), 745 So.2d 653, recognized that the NHWA was not the exclusive remedy available to purchasers in their action against a builder based on their builder's failure to complete the construction of their home. In drawing this conclusion, the second circuit found that the purchasers could bring a breach of contract claim as well as a claim under the NHWA. Id. The court reached this decision based on an examination of the language of the NHWA located at La.R.S. 9:3150. The court found that the language "relative to warranties and redhibitory vices and defects" meant that only claims regarding warranties of the builder or defects were excluded. Id. at 658. The court concluded that the NHWA was designed to protect the owner from faulty workmanship, but not to insure completion of the construction of a new home under the terms of the contract between the owner and the builder. Id. Accordingly, the second circuit held that where a builder abandons construction of a home and fails to fulfill his obligations under the contract, he could be sued for breach of contract as well as warranties available under the NHWA. Id.
In summary, we find that the only reasonable interpretation of the NHWA is one which excludes mobile homes. Therefore, we reverse our case law which is inconsistent with this opinion. Accordingly, we find this assignment of error without merit.

EXPERT TESTIMONY
At oral argument, Cappaert strenuously argued that Ms. Dalme failed to prove her cause of action in redhibition because she presented no expert testimony regarding violations of the applicable standards. The USMCH at La.R.S. 51:911.23(F) provides, "[i]n any redhibitory action brought against the seller of a manufactured home or mobile home, the standards set forth in the Code shall be considered in establishing whether or not a defect exists." The Code is the National Mobile Home Construction and Safety Standards Act (the Code), 42 U.S.C. 5401 et seq., and the *1026 federal regulations promulgated pursuant to that legislation. La.R.S. 51:911.22.
A review of the Code reveals that, like the USMCH, it focuses on increasing the protection given to the purchasers of mobile homes. The Code states:
[T]he purposes of this chapter are to reduce the number of personal injuries and deaths and the amount of insurance costs and property damage resulting from manufactured home accidents and to improve the quality and durability of manufactured homes. Therefore, the Congress determines that it is necessary to establish Federal construction and safety standards for manufactured homes and to authorize manufactured home safety research and development.
42 U.S.C.A. 5401.
In line with this goal, the Code provides that the manufacturer of manufactured housing must furnish notification of any defect in its product which creates an imminent safety hazard to the purchaser of such manufactured home within a reasonable time of its discovery of the defect. 42 U.S.C.A. 5414(a). The Code also burdens the manufacturer by mandating that it furnish to the distributor or dealer, at the time of delivery, certification that the manufactured home conforms to all applicable Federal construction and safety standards. 42 U.S.C.A. 5415. Thus, from a reading of the Code, it seems apparent that the manufacturer bears the burden of proving that it has complied with the standards set forth in the Code.
Unfortunately, as our court has been laboring under the impression that the NHWA applied to mobile homes, little case law has developed concerning the use of the Code's standards in redhibition actions. In Bott v. Sterling Homes, Inc. of Lafayette, 527 So.2d 548 (La.App. 3 Cir. 1988), our court held that a trial court may properly consider the standards contained in the Code in determining whether a mobile home was defective. In that instance, the manufacturer of the mobile home argued that the trial court should not have considered the applicable HUD regulations in evaluating the plaintiff's redhibition claim. Id. The manufacturer urged that once a home was built in accordance with the standards set forth in the Code, then it could never be found to be redhibitorily defective. Id. In evaluating this argument, our court stated:
[A]s correctly stated by counsel for plaintiff in his appellate brief, [the manufacturer's interpretation] is a very narrow interpretation of La.R.S. 51:911.23(F). We find that the correct interpretation of the statute was stated by Mr. Dave Aymonds, an inspector for the State Fire Marshall's office. Aymonds testified that the HUD regulations are regulatory of the end-result or finished product and not the method by which the mobile homes are to be constructed. This is important when considering the fact that the mobile home has severe water damage which is attributable to either water leaks or condensation. Aymonds stated unequivocably that if either of these two conditions are present, it is in itself a violation of the standards. Moreover, Aymond testified that upon inspection of the mobile home, he found it to be in a condition which is substandard under the regulations.
Further support that the Federal regulations were properly considered can be found in the testimony of Mr. Dan Baird, an expert in Housing and Urban Development regulations. Baird opined that the water damage to plaintiff's home was most likely due to condensation and that a home manufactured to HUD standards should not condensate.
(Emphasis added.) Bott, 527 So.2d 548, 550 (La.App. 3 Cir.1988). In Bott, the expert testimony we received regarding the applicable HUD standards was persuasive evidence that redhibitory defects existed in that mobile home. Id. If the home had been constructed according to the HUD standards, the defects apparent in that mobile home would not have existed. *1027 Id. However, nowhere in that opinion did we mandate that an expert must be called to establish national standards violations in every mobile home redhibition case. Instead, we viewed the evidence regarding the violation of the standards as a guide for determining whether redhibitory defects existed in that particular mobile home.
Over a decade later, in Rodriguez v. Prudhomme Mobile Homes, 98-1384 (La. App. 3 Cir. 3/3/99), 737 So.2d 75, a seller successfully argued that in order to establish a prima facie case in a redhibitory action against the seller of a mobile home, there must be evidence of a violation of the applicable standards. Without any discussion on the matter, the court concluded that a violation of the standards in the Code must be shown to establish an action in redhibition.
It is now apparent that our decision in Rodriguez was in error. The Code and the USMCH were enacted to increase the protections provided to purchasers of mobile homes. To mandate that a plaintiff bring evidence, expert or otherwise, to show a violation of the national standards and thereby prove his action in redhibition, is an absurd reading of the USMCH's mandate that the Code be considered. What is more reasonable, in light of the language of the Code and the heavy burden it places on manufacturers, is to place the burden on manufacturers to show that there has been no violation of the standards established pursuant to the Code. Even where a manufacturer can show facial compliance with these standards, we are not prepared to say that such compliance is enough to negate the plaintiff's action in redhibition. An action in redhibition exists not only for those purchasers who assert that their mobile home is unsafe (as contemplated by the Code), but for those purchasers who are able to prove that their mobile homes are so defective that they would not have purchased their mobile homes had they known of the defects. See La.Civ.Code art. 2520.
In summary, we find that the trial court did not err in failing to require that Ms. Dalme present expert testimony in order to prove a violation of the Code. Furthermore, we hold that Rodriguez is overruled in so far as it requires a plaintiff to prove a violation of the Code in order to establish an action in redhibition. Accordingly, we find this assignment of error without merit.

ASSESSMENT OF DAMAGES
In Cappaert's third assignment of error, it makes several arguments as to why the trial court erred in assessing damages in the instant case. Cappaert argues that Ms. Dalme did not offer any testimony or evidence which would establish the costs of repairing the damages to the mobile home; that the amount awarded by the trial court exceeded the costs of repairs; that it should be given an offset against the damages assessed for the rental value of the mobile home; that the amount of $28,653.95 awarded by the trial court was more than the purchase price of $27,577.11, and that the trial court improperly awarded attorney fees under the NHWA.
In addition, Cappaert argues that Ms. Dalme did not offer any testimony or evidence which would establish what it would cost to repair the damages to the mobile home and that the amount awarded by the trial court exceeded the costs of repairs. In support of this argument, Cappaert asserts that Ms. Dalme did not offer any testimony or evidence which would establish what it would cost to repair the damages or defects with the mobile home. Cappaert argues that the applicable measure of damages is defined in Graf v. Jim Walter Homes, Inc., 97-1143 (La.App. 1 Cir. 5/15/98), 713 So.2d 682. Graf provides that, "[i]n an action on a contract to build, the appropriate measure of damages resulting from the contractor's breach of the implied warranty of good workmanship is generally the costs of repairs when the *1028 thing can be repaired." Id. at 691. In Graf, however, the first circuit was dealing with an action under the NHWA. In the instant case, we are dealing with an action in redhibition. Therefore, the standard used to measure damages in Graf is not applicable in the instant case.
A plaintiff who seeks the recission of a sale in redhibition must prove: 1) the thing sold is absolutely useless for its intended purpose or that its use is so inconvenient that it must be supposed that he would not have bought it had he known of the defect; 2) that the defect existed at the time he purchased the thing, but was neither known or apparent to him; 3) that the seller was given the opportunity to repair the defect. Rodriguez, 98-1384, 737 So.2d 75. The plaintiff need not give a manufacturer an opportunity to repair a defect in the thing sold. See La.Civ.Code art. 2531; Newman v. Dixie Sales Serv., 387 So.2d 1333 (La.App. 1 Cir.1980). Once such an action is proven against a manufacturer, the trial court may award the purchaser the return of the purchase price with interest from the time it was paid, the reimbursement of reasonable expenses occasioned by the sale, reasonable expenses occasioned by the preservation of the thing, damages, and reasonable attorney fees. See La.Civ.Code art. 2545. Accordingly, Ms. Dalme did not have to establish the cost of repairs to the trailer in order to prove her cause of action in redhibition. In addition, Ms. Dalme's claim to damages in redhibition was not limited to the cost of repairs. Therefore, we find Cappaert's argument on this point without merit.
In addition, Cappaert argues that the trial court erred when it made an award of $28,653.95, instead of the contract amount of $27,577.11. Ms. Dalme has acknowledged in her brief that Cappaert is correct in its assertion. Ms. Dalme points to exhibit P-1, the contract between the parties, which indicates that the contract price was $27,577.11, not $28,653.95 as awarded. After a review of the record, this court agrees that the trial court erred in awarding Ms. Dalme $28,653.95 instead of the contract price of $27,577.11. Accordingly, we modify the award of the trial court to reflect an award of $27,577.11 instead of $28,653.95.
Furthermore, Cappaert argues that the trial court erred in failing to give it a set-off of $600.00 a month for rent. In support of its argument, Cappaert asserts that Ms. Dalme testified that homes such as hers had rented for between $500 600 a month. Cappaert further argues that Ms. Dalme resided in the mobile home from the date of its purchase on February 13, 1998, until the day of trial, with the exception of three or four months. A trial court may, at its discretion, choose to allow a manufacturer a credit for the buyer's use of the thing if such a credit is warranted under the facts. See La.Civ.Code art. 2545; John Deere Indus. Equipment Co. v. Willett Timber Co., Inc., 380 So.2d 182 (La.App. 3 Cir.), writ denied, 381 So.2d 1234 (La.1980).
Compensation for the buyer's use of a defective product is not automatically granted by the courts. See Alexander v. Burroughs Corp., 359 So.2d 607 (La. 1978). The seller has the burden of proving the value of the buyer's use of the product. Holloway v. Gulf Motors, Inc., 588 So.2d 1322 (La.App. 2d Cir. 1991). However, even the value of extensive use may be overridden by great inconveniences incurred because of the defective nature of the thing and constant interruptions in service caused by the seller's attempts to repair. Alexander, supra, at p. 611.
Boudreaux v. Harvey, Inc., 629 So.2d 429, 431(La.App. 3 Cir.1993).
In the instant case, the trial judge denied the set-off stating, "the record indicates that the conditions of the mobile home were so bad that Ms. Dalme actually moved out of it and apparently would have stayed out of it except that her son needed to sale [sic] the trailer she was living in." *1029 After a review of the record, we agree with the trial judge that no set-off is warranted in this case. Accordingly, we find Cappaert's argument on the matter without merit.
Finally, Cappaert argues that attorney fees were improperly awarded in this matter. In support of this assertion, Cappaert asserts that Ms. Dalme was not entitled to any attorney fees under the NHWA. As this court has found that the NHWA does not apply to this action, and the applicable law in this matter is that of redhibition, Cappaert's assertion is without merit. Reasonable attorney fees are available in a redhibition action against a manufacturer. See La.Civ.Code art. 2545. Therefore, the trial court did not err in awarding attorney fees against Cappaert, the manufacturer of Ms. Dalme's home.

DECREE
Based on the foregoing discussion, we affirm, as amended, the decision of the trial court. All costs of appeal are assessed to Cappaert.
AFFIRMED AS AMENDED.
DOUCET, C.J., concurs.
AMY, J., concurs in part and dissents in part and assigns reasons.
DOUCET, C.J., concurring.
In this case, the New Home Warranty Act and the Louisiana Uniform Standard's Code for Mobile Homes and Manufactured Housing cannot be harmonized so as to apply in this case. Since the Louisiana Uniform Standard's Code for Mobile Homes and Manufactured Housing are more specifically directed to the matter, it should be applied to this case. Therefore, I respectfully concur with the majority opinion here.
AMY, J., concurring in part, dissenting in part.
I concur in the majority's determination that the New Home Warranty Act is inapplicable to actions against manufacturers of mobile homes. With the remainder of the decision, however, I respectfully dissent finding that the plaintiff failed to prove a cause of action in redhibition.
The Louisiana Civil Code provides for recovery in redhibition as follows:
Art. 2520. Warranty against redhibitory defects.
The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.
A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.
A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.
Art. 2522. Notice of existence of defect.
The buyer must give the seller notice of the existence of a redhibitory defect in the thing sold. That notice must be sufficiently timely as to allow the seller the opportunity to make the required repairs. A buyer who fails to give that notice suffers diminution of the warranty to the extend the seller can show that the defect could have been repaired or that the repairs would have been less burdensome, had he received timely notice.
Such notice is not required when the seller has actual knowledge of the existence of a redhibitory defect in the thing sold.
Art. 2530. Defect must exist before delivery.
The warranty against redhibitory defects covers only defects that exist at the *1030 time of delivery. The defect shall be presumed to have existed at the time of the delivery if it appears within three days from that time.
Art. 2531. Liability of seller who knew not of the defect.
A seller who did not know that the thing he sold had a defect is only bound to repair, remedy, or correct the defect. If he is unable or fails so to do, he is then bound to return the price to the buyer with interest from the time it was paid, and to reimburse him for the reasonable expenses occasioned by the sale, as well as those incurred for the preservation of the thing, less the credit to which the seller is entitled if the use made of the thing, or the fruits it has yielded, were of some value to the buyer.
A seller who is held liable for a redhibitory defect has an action against the manufacturer of the defective thing, if the defect existed at the time the thing was delivered by the manufacturer to the seller, for any loss the seller sustained because of the redhibition. Any contractual provision that attempts to limit, diminish or prevent such recovery by a seller against the manufacturer shall have no effect.
Art. 2545. Liability of seller who knows of the defect; presumption of knowledge.
A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney's fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits.
A seller is deemed to know that the thing he sells has a redhibitory defect when he is the manufacturer of that thing.
Here, the plaintiff brought redhibition actions against the seller, Blockers Manufactured Housing, and the manufacturer, Cappeart Manufactured Housing. For purposes of this discussion, only the action against the manufacturer is at issue. While much of the language in the above codal provisions refer to obligations of the "seller," jurisprudence clearly indicates that a buyer has a right of action against all sellers, including the primary manufacturer. Jackson v. Slidell Nissan, 96-1017 (La.App. 1 Cir. 5/9/97), 693 So.2d 1257.
In rendering judgment in this case, the trial court determined that the plaintiff demonstrated that defects existed so as to warrant rescission and that the defects were the responsibility of the manufacturer. As explained in Carpenter v. Lafayette Woodworks, 94-1011 (La.App. 3 Cir. 2/1/95), 653 So.2d 1187, a trial court's determination of whether defects are sufficient to warrant rescission or whether they are only inconvenient and merely warrant a reduction in the price is factual in nature. Accordingly, an appellate court gives great weight to the trial court's findings and will not disturb them absent manifest error. Id. My review of the record in this case reveals such error.
Much of the difficulty with the plaintiff's case stems from the fact that the situation presented here does not deal with a typical manufacturer/retailer/buyer situation. Rather, the record indicates that Ms. Dalme purchased the manufactured home and a company contracted by Blockers transported the home from the Blockers' lot and leveled or "blocked" the home at the homesite. Ms. Dalme testified that she was responsible for having the plumbing connected, a task she employed a plumbing company to perform. It is unclear from the evidence presented what *1031 defects arose from any particular step of the process.
Kenneth Prine, a mobile-home repair contractor who performs work for Cappaert, testified that he went to the home to attend to a list of problems Ms. Dalme had compiled. The list included several spots on the kitchen flooring she marked as "soft," the need for releveling, a complaint that the chimney was crooked, loose molding and trim on the kitchen window, difficulty in turning faucets, cracked molding, and unlevel or difficult to close doors. The plaintiff also included her desire for new insulation to be placed under the trailer because of her feeling that the existing insulation had been soaked from leaks from the plumbing. Both her testimony and that of Mr. Prine indicate that the majority of these complaints were repaired. Mr. Prine testified that manufactured homes experience a routine number of problems after transport and that problems with cracks, loose molding, and shifted doors or cabinets can be associated with transport.
At the time of trial, Ms. Dalme testified that faulty plumbing and roof rumble were her main unresolved complaints. Others from the list remained as well. While the plaintiff sought rescission only, and did not alternatively seek quanti minoris recovery, Cappaert presented testimony from its own expert, Harold Mouser, indicating that the items remaining on the list that, to his understanding, had not been resolved would cost approximately $750.00 to rectify.[1] He stated that this figure would exclude reblocking the home which he believed was the cause of many of the problems. He explained that the blocking would cost approximately $75.00 to $100.00. Thus, the only testimony presented as to the expense of correcting the problems complained of, but left unresolved, indicates that those problems could be solved for less than one thousand dollars. The home cost in excess of $27,000.00.
Given the estimated cost of the repairs sought, I conclude that it was manifestly erroneous for the trial court to find that rescission of the sale was required. The minimal cost of these repairs, even those that may not be attributable to the manufacturer, indicates that the problems are not such that it "renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect." Thus, under La.Civ. Code art. 2520, rescission of the sale is not available. However, I am mindful as well that La.Civ.Code art. 2545 provides for extensive recovery for a seller who knows that the thing sold contains redhibitory defects and that a manufacturer is presumed to have known of such defects when the thing is sold. Again, the plaintiff has failed to demonstrate that the defects complained of are in fact redhibitory defects in that it is unclear, from the plaintiffs evidence, at which point the problems arose. Some are of the type related to transport and blocking while others are related to plumbing, the connection of which was the responsibility of the plaintiff. It is important to point out that the plaintiff failed to present evidence, other than her own testimony, as to the nature of the problems. Given the type of limited evidence presented, I do not conclude that the plaintiff has shown entitlement to rescission of the sale under La.Civ.Code art. 2520 or the remedies available under Article 2545. While the plaintiff may have demonstrated entitlement to quanti minoris recovery to some extent, which may have been available under Article 2520, her petition sought only rescission.
La.Code Civ.P. art. 891(A) requires:

*1032 The petition shall comply with Articles 853, 854, and 863, and, whenever applicable, with Articles 855 and 861. It shall set forth the name, surname, and domicile of the parties; shall contain a short, clear, and concise statement of all causes of action arising out of, and of the material facts of, the transaction or occurrence that is the subject matter of the litigation; shall designate an address, not a post office box, for receipt of service of all items involving the litigation; and shall conclude with a prayer for judgment for the relief sought. Relief may be prayed for in the alternative.
La.Code Civ.P. art. 862 also instructs that "a final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general or equitable relief." As the theory of the case doctrine has been abolished, a party may be granted any relief to which is he is entitled given the pleadings and the evidence presented. First South Prod. Credit Ass'n v. Georgia Pacific, 585 So.2d 545 (La.1991).
My review indicates that neither the pleadings nor the evidence presented allow the plaintiff's recovery in this case. No attempt to expand the plaintiffs prayer for rescission was made in that the plaintiff presented no testimony regarding the expense of the needed repairs. These were presented, in defense, only by Cappaert. Thus, the situation is one where the only relief asked for by the plaintiff was left unproven while the evidence presented precluded recovery for that relief to which she may have been entitled. Accordingly, I find that reversal of the trial court's rescission of the sale is warranted. From the portion of majority opinion affirming the amended judgment, I respectfully dissent.
NOTES
[1] The parties have presented this court with "Notice of Commencement of Case under Chapter 7 of The Bankruptcy Code, Meeting of Creditors, and Fixing of Dates." See In Re Blocker's Manufactured Homes, Inc., case number 00-31002, filed in the United States Bankruptcy Court for the Western District of Louisiana. Per 11 U.S.C. 362(a), the filing of the petition in this regard stays continuation of this matter before this court insofar as it relates to Blockers. See Bertini v. Britton, 93-0779 (La.App. 1 Cir. 4/8/94), 635 So.2d 712, writ denied, 94-1203 (La.9/2/94), 643 So.2d 142; United Bldg. Co. v. Harp, 25,852 (La. App. 2 Cir. 6/22/94), 639 So.2d 349; Gulfco Finance of Farmerville, Inc. v. McCormick, 577 So.2d 778 (La.App. 2 Cir.1991).
[2] "Mr. Sidney Fazio presented this bill and explained it would clarify the present law and do away with the perpetual warranty that presently exists for home builders. It would provide for exclusive warranties of residential home builders to owners of newly constructed homes." (Emphasis added.) Louisiana Senate Committee on Judiciary, Minutes of Meeting of May 13, 1986, Senate Bill No. 57 by Senator Bares, p. 7.

"Representative Thompson presented Senate Bill 57 which provides for express and exclusive warranties of residential home builders for newly constructed homes." (Emphasis added.). Louisiana Legislature House of Representatives, Civil Law and Procedure Committee, Minutes of Meeting of June 9, 1996, Senate Bill No. 57 by Senator Bares, p. 2.
"Mr. Johnny Koch, Louisiana Homebuilders Association, ... appeared before the committee in support of Senate Bill No. 413. He stated that the New Home Warranty Act would define the rights, duties, and responsibilities of a new home purchaser and a new home builder." (Emphasis added.). Minutes of the House Commerce Committee Meeting of May 17, 1999, Senate Bill No. 413 by Senator Heitmeier, p. 2.
[3] A national statute, the National Mobile Home Construction and Safety Standards Act, 42 U.S.C. 5401, et seq., also deals specifically with mobile homes. The USCMH appears to have been adopted pursuant to 42 U.S.C. 5422 which allows a state to assert jurisdiction over any manufactured home construction or safety issue which has not been covered by the federal standards and/or to enforce the federal standards pursuant to a plan approved by the Secretary of Housing and Urban Development.
[4] Again, we note that these provisions appear to be adopted pursuant to and in conformity with the National Mobile Home Construction and Safety Standards Act, 42 U.S.C. 5401, et seq.
[1] Mr. Mouser testified that solving the roof rumble would cost $300.00 to $400.00, with labor running $15.00 to $20.00 per hour for a half day's work. He explained that materials and labor to replace the linoleum in the kitchen, as requested by Ms. Dalme, would cost around $175.00, while the scratched bar top would cost about $75.00. He also added that the home needed to be pressure washed and estimated the expense to be $100.00.